## VIRGINIA *v.* RIVES.

1. Sect. 641 of the Revised Statutes, which provides for the removal into the Federal court of any civil suit or prosecution "commenced in any State court, for any cause whatsoever, against any person who is denied or cannot enforce in the judicial tribunals of the State, or in the part of the State where such suit or prosecution is pending, any right secured to him by any law providing for the equal civil rights of citizens of the United States," &c., examined in connection with sects. 1977 and 1978. *Held*, that the object of these statutes, as of the Constitution which authorized them, was to place, in respect to civil rights, the colored race upon a level with the white. They made the rights and responsibilities, civil and criminal, of the two races exactly the same.

2. The prohibitions of the Fourteenth Amendment have exclusive reference to State action. It is the State which is prohibited from denying to any person within its jurisdiction the equal protection of the laws, and, consequently, the statutes founded upon the amendment, and partially enumerating what civil rights the colored man shall enjoy equally with the white are intended for protection against State infringement of those rights Sect. 641 was also intended to protect them against State action, and against that alone.

3. A State may exert her authority through different agencies, and those prohibitions extend to her action denying equal protection of the laws, whether it be action by one of these agencies or by another. Congress, by virtue of the fifth section..of the Fourteenth Amendment, may enforce the prohibitions whenever they are disregarded by either the Legislative, the Executive, or the Judicial Department of the State. The mode of enforcement is left to its discretion. It may secure the right, that is, enforce its recognition, by removing the case from a State court, in which it is denied, into a Federal court, where it will be acknowledged.

4. But the Fourteenth Amendment is broader than sect. 641, as the latter does not apply to *all* cases in which the equal protection of the laws may be denied to a defendant. The removal thereby authorized is before trial or final hearing. But the violation of the constitutional prohibitions, when committed by the judicial action of a State, may be, and generally will be, after the trial or final hearing has commenced. It is during the trial or final hearing the defendant is denied equality of legal protection, and not until then. Nor can he know until then that the equal protection of the laws will not be extended to him. Certainly not until then can he affirm that it is denied. To such a case — that is, to judicial infractions of the constitutional amendment after the trial has commenced — sect. 641 has no applicability. It was not intended to reach such cases. They were left to the revisory power of this court.

5. Therefore, the denial or inability to enforce in the judicial tribunals of a State rights secured to a defendant by any law providing for the equal civil rights of all persons citizens of the United States, of which sect. 641 speaks, is primarily, if not exclusively, a denial of such rights, or an inability to enforce them, resulting from the Constitution or laws of the State, rather

than a denial made manifest at the trial of the case. In other words, the stat-
ute has reference to a legislative denial or an inability resulting from it. By
express requirement of the statute, the party must set forth, under oath,
the facts upon which he bases his claim to have his case removed, not
merely his belief that he cannot enforce his rights at a subsequent stage of
the proceedings. But, in the absence of constitutional or legislative impedi-
ment, he cannot swear before his case comes to trial that his enjoyment of
his civil rights is denied to him.

6. The Constitution and laws of Virginia do not exclude colored citizens from
service on juries. The petition for removal did not present a case under
sect. 641.

7. The defendant moved in the State court that the *venire* be so modified that
one-third or some portion of the jury should be composed of his own race.
The denial of that motion was not a denial of a right secured to him by
any law providing for the equal civil rights of citizens of the United States,
or by any statute, or by the Fourteenth Amendment. A mixed jury in
a particular case is not essential to the equal protection of the laws. It *is*
a right to which any colored man is entitled, that, in the selection of
jurors to pass upon his life, liberty, or property, there shall be no exclusion
of his race, and no discrimination against them, because of his color. But
that is a different thing from that which was claimed, as of right, and
denied in the State court; viz., a right to have the jury composed in part
of colored men.

8. A *mandamus* does not lie to control judicial discretion, except when that dis
cretion has been abused. But it may be used as a remedy where the case
is outside of that discretion and outside the jurisdiction of the court or
. officer to which or to whom the writ is directed. One of its peculiar and
more common uses is to restrain inferior courts, and keep them within their
lawful bounds.

PETITION for *mandamus.*

The facts are stated in the opinion of the court.

*Mr. James G. Field,* Attorney-General of Virginia, and *Mr
William J. Robertson,* for the petitioner.

*Mr. Charles Devens* and *Mr. W. Willoughby, contra.*

MR. JUSTICE STRONG delivered the opinion of the court.

The questions presented in this case arise out of the following
facts : —

Burwell Reynolds and Lee Reynolds, two colored men, were
jointly indicted for murder in the county court of Patrick
County, Virginia, at its January Term, 1878. The case having
been removed into the Circuit Court of the State, and brought
on for trial, the defendants moved the court that the *venire,*
which was composed entirely of the white race, be modified
so as to allow one-third thereof to be composed of colored

men.  This motion was overruled on the ground that the
court "had no authority to change the *venire*, it appearing
(as the record stated) to the satisfaction of the court that the
*venire* had been regularly drawn from the jury-box according
to law."  Thereupon the defendants, before the trial, filed their
petition, duly verified, praying for a removal of the case into
the Circuit Court of the United States for the Western District
of Virginia.  This petition represented that the petitioners were
negroes, aged respectively seventeen and nineteen years, and
that the man whom they were charged with having murdered
was a white man.  It further alleged that the right secured to
the petitioners by the law providing for the equal civil rights of
all the citizens of the United States was denied to them in the
judicial tribunals of the county of Patrick, of which county
they are natives and citizens; that by the laws of Virginia all
male citizens, twenty-one years of age, and not over sixty, who
are entitled to vote and hold office under the Constitution and
laws of the State, are made liable to serve as jurors; that this
law allows the right, as well as requires the duty, of the race
to which the petitioners belong to serve as jurors; yet that the
grand jury who found the indictment against them, as well as
the jurors summoned to try them, were composed entirely of
the white race.  The petitioners further represented that they
had applied to the judge of the court, to the prosecuting attor-
ney, and to his assistant counsel, that a portion of the jury by
which they were to be tried should be composed in part of
competent jurors of their own race and color, but that this right
had been refused them.  The petition further alleged that a
strong prejudice existed in the community of the county against
them, independent of the merits of the case, and based solely
upon the fact that they are negroes, and that the man they
were accused of having murdered was a white man.  From
that fact alone they were satisfied they could not obtain an
impartial trial before a jury exclusively composed of the white
race.  The petitioners further represented that their race had
never been allowed the right to serve as jurors, either in civil
or criminal cases, in the county of Patrick, in any case, civil or
criminal, in which their race had been in any way interested.
They therefore prayed that the prosecution might be removed

into the Circuit Court of the United States. The State court denied this prayer, and proceeded with the trial, when each of the defendants was convicted. The verdicts and judgments were, however, set aside, and a motion for a removal of the case was renewed on the same petition, and again denied. The defendants were then tried again separately. One was convicted and sentenced, and a bill of exceptions was duly signed and made part of the record. In the other case the jury disagreed.

In this stage of the proceedings a copy of the record was obtained, the cases were, upon petition, ordered to be docketed in the Circuit Court of the United States, Nov. 18, 1878, which was at its next succeeding term after the first application for removal, and a writ of *habeas corpus cum causa* was issued, by virtue of which the defendants were taken from the jail of Patrick County into the custody of the United States marshal, and they are now held in jail subject to the control of that court.

No motion has been made in the Circuit Court to remand the prosecutions to the State court, but the Commonwealth of Virginia has applied to this court for a rule to show cause why a *mandamus* should not issue commanding the judge of the District Court of the Western District of Virginia, the Hon. Alexander Rives, to cause to be redelivered by the marshal of said district to the jailer of Patrick County the bodies of the said Lee and Burwell Reynolds, to be dealt with according to the laws of the said Commonwealth. The rule has been granted, and Judge Rives has returned an answer setting forth substantially the facts hereinbefore stated, and averring that the indictments were removed into the Circuit Court of the United States by virtue of sect. 641 of the Revised Statutes.

If the petition filed in the State court before trial, and duly verified by the oath of the defendants, exhibited a sufficient ground for a removal of the prosecutions into the Circuit Court of the United States, they were in legal effect thus removed, and the writ of *habeas corpus* was properly issued. All proceedings in the State court subsequent to the removals were *coram non judice* and absolutely void. This, by virtue of the express declaration of sect. 641 of the Revised Statutes, which enacts that, "upon the filing of such petition, all fur-

ther proceedings in the State court shall cease, and shall not be resumed except as thereinafter provided." In *Gordon* v. *Longest* (16 Pet. 97), it was ruled by this court that when an application to remove a cause (removable) is made in proper form, and no objection is made to the facts upon which it is founded, " it is the duty of the State court to ' proceed no further in the cause,' and every step subsequently taken in the exercise of jurisdiction in the case, whether in the same court or in the Court of Appeals, is *coram non judice.*" To the same effect is *Insurance Company* v. *Dunn,* 19 Wall. 214.

It is, therefore, a material inquiry whether the petition of the defendants set forth such facts as made a case for removal, and consequently arrested the jurisdiction of the State court and transferred it to the Federal court. Sect. 641 of the Revised Statutes provides for a removal " when any civil suit or prosecution is commenced in any State court, for any cause whatsoever, against any person who is denied or cannot enforce in the judicial tribunals of the State, or in the part of the State where such suit or prosecution is pending, any right secured to him by any law providing for the equal civil rights of citizens of the United States," &c. It declares that such a case may be removed before trial or final hearing.

Was the case of Lee and Burwell Reynolds such a one? Before examining their petition for removal, it is necessary to understand clearly the scope and meaning of this act of Congress. It rests upon the Fourteenth Amendment of the Constitution and the legislation to enforce its provisions. That amendment declares that no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws. It was in pursuance of these constitutional provisions that the civil rights statutes were enacted. Sects. 1977, 1978, Rev. Stat. They enact that all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property

as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. Sect. 1978 enacts that all citizens of the United States shall have the same right in every State and Territory as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property. The plain object of these statutes, as of the Constitution which authorized them, was to place the colored race, in respect of civil rights, upon a level with whites. They made the rights and responsibilities, civil and criminal, of the two races exactly the same.

The provisions of the Fourteenth Amendment of the Constitution we have quoted all have reference to State action exclusively, and not to any action of private individuals. It is the State which is prohibited from denying to any person within its jurisdiction the equal protection of the laws, and consequently the statutes partially enumerating what civil rights colored men shall enjoy equally with white persons, founded as they are upon the amendment, are intended for protection against State infringement of those rights. Sect. 641 was also intended for their protection against State action, and against that alone.

It is doubtless true that a State may act through different agencies, — either by its legislative, its executive, or its judicial authorities; and the prohibitions of the amendment extend to all action of the State denying equal protection of the laws, whether it be action by one of these agencies or by another. Congress, by virtue of the fifth section of the Fourteenth Amendment, may enforce the prohibitions whenever they are disregarded by either the Legislative, the Executive, or the Judicial Department of the State. The mode of enforcement is left to its discretion. It may secure the right, that is, enforce its recognition, by removing the case from a State court in which it is denied, into a Federal court where it will be acknowledged. Of this there can be no reasonable doubt. Removal of cases from State courts into courts of the United States has been an acknowledged mode of protecting rights ever since the foundation of the government. Its constitutionality has never been seriously doubted. But it is still a

question whether the remedy of removal of cases from State courts into the courts of the United States, given by sect. 641, applies to all cases in which equal protection of the laws may be denied to a defendant. And clearly it does not. The constitutional amendment is broader than the provisions of that section. The statute authorizes a removal of the case only before trial, not after a trial has commenced. It does not, therefore, embrace many cases in which a colored man's right may be denied. It does not embrace a case in which a right may be denied by judicial action during the trial, or by discrimination against him in the sentence, or in the mode of executing the sentence. But the violation of the constitutional provisions, when made by the judicial tribunals of a State, may be, and generally will be, after the trial has commenced. It is then, during or after the trial, that denials of a defendant's right by judicial tribunals occur. Not often until then. Nor can the defendant know until then that the equal protection of the laws will not be extended to him. Certainly until then he cannot affirm that it is denied, or that he cannot enforce it, in the judicial tribunals.

It is obvious, therefore, that to such a case — that is, a judicial infraction of the constitutional inhibitions, after trial or final hearing has commenced — sect. 641 has no applicability. It was not intended to reach such cases. It left them to the revisory power of the higher courts of the State, and ultimately to the review of this court. We do not say that Congress could not have authorized the removal of such a case into the Federal courts at any stage of its proceeding, whenever a ruling should be made in it denying the equal protection of the laws to the defendant. Upon that subject it is unnecessary to affirm any thing. It is sufficient to say now that sect. 641 does not.

It is evident, therefore, that the denial or inability to enforce in the judicial tribunals of a State, rights secured to a defendant by any law providing for the equal civil rights of all persons citizens of the United States, of which sect. 641 speaks, is primarily, if not exclusively, a denial of such rights, or an inability to enforce them, resulting from the Constitution or laws of the State, rather than a denial first made manifest at the trial of the case. In other words, the statute has reference

to a legislative denial or an inability resulting from it. Many such cases of denial might have been apprehended, and some existed. Colored men might have been, as they had been, denied a trial by jury. They might have been excluded by law from any jury summoned to try persons of their race, or the law might have denied to them the testimony of colored men in their favor, or process for summoning witnesses. Numerous other illustrations might be given. In all such cases a defendant can affirm, on oath, before trial, that he is denied the equal protection of the laws or equality of civil rights. But in the absence of constitutional or legislative impediments he cannot swear before his case comes to trial that his enjoyment of all his civil rights is denied to him. When he has only an apprehension that such rights will be withheld from him when his case shall come to trial, he cannot affirm that they are actually denied, or that he cannot enforce them. Yet such an affirmation is essential to his right to remove his case. By the express requirement of the statute his petition must set forth the facts upon which he bases his claim to have his case removed, and not merely his belief that he cannot enforce his rights at a subsequent stage of the proceedings. The statute was not, therefore, intended as a corrective of errors or wrongs committed by judicial tribunals in the administration of the law at the trial.

The petition of the two colored men for the removal of their case into the Federal court does not appear to have made any case for removal, if we are correct in our reading of the act of Congress. It did not assert, nor is it claimed now, that the Constitution or laws of Virginia denied to them any civil right, or stood in the way of their enforcing the equal protection of the laws. The law made no discrimination against them because of their color, nor any discrimination at all. The complaint is that there were no colored men in the jury that indicted them, nor in the petit jury summoned to try them. The petition expressly admitted that by the laws of the State all male citizens twenty-one years of age and not over sixty, who are entitled to vote and hold office under the Constitution and laws thereof, are made liable to serve as jurors. And it affirms (what is undoubtedly true) that this law allows the right, as

well as requires the duty, of the race to which the petitioners belong to serve as jurors. It does not exclude colored citizens.

Now, conceding as we do, and as we endeavored to maintain in the case of *Strauder* v. *West Virginia* (*supra*, p. 303), that discrimination by law against the colored race, because of their color, in the selection of jurors, is a denial of the equal protection of the laws to a negro when he is put upon trial for an alleged criminal offence against a State, the laws of Virginia make no such discrimination. If, as was alleged in the argument, though it does not appear in the petition or record, the officer to whom was intrusted the selection of the persons from whom the juries for the indictment and trial of the petitioners were drawn, disregarding the statute of the State, confined his selection to white persons, and refused to select any persons of ' the colored race, solely because of their color, his action was a gross violation of the spirit of the State's laws, as well as of the act of Congress of March 1, 1875, which prohibits and punishes such discrimination. He made himself liable to punishment at the instance of the State and under the laws of the United States. In one sense, indeed, his act was the act of the State, and was prohibited by the constitutional amendment. But inasmuch as it was a criminal misuse of the State law, it cannot be said to have been such a " denial or disability to enforce *in the judicial tribunals of the State*" the rights of colored men, as is contemplated by the removal act. Sect. 641. It is to be observed that act gives the right of removal only to a person " who is denied, or cannot enforce, in *the judicial tribunals of the State* his equal civil rights." And this is to appear before trial. When a statute of the State denies his right, or interposes a bar to his enforcing it, in the judicial tribunals, the presumption is fair that they will be controlled by it in their decisions ; and in such a case a defendant may affirm on oath what is necessary for a removal. Such a case is clearly within the provisions of sect. 641. But when a subordinate officer of the State, in violation of State law, undertakes to deprive an accused party of a right which the statute law accords to him, as in the case at bar, it can hardly be said that he is denied, or cannot enforce, " in the judicial tribunals of the State " the rights which belong to him. In such a case it ought to be pre-

sumed the court will redress the wrong. If the accused is deprived of the right, the final and practical denial will be in the judicial tribunal which tries the case, after the trial has commenced. If, as in this case, the subordinate officer whose duty it is to select jurors fails to discharge that duty in the true spirit of the law ; if he excludes all colored men solely because they are colored; or if the sheriff to whom a *venire* is given, composed of both white and colored citizens, neglects to summon the colored jurors only because they are colored; or if a clerk whose duty it is to take the twelve names from the box rejects all the colored jurors for the same reason, — it can with no propriety be said the defendant's right is denied by the State and cannot be enforced in the judicial tribunals. The court will correct the wrong, will quash the indictment or the panel, or, if not, the error will be corrected in a superior court. We cannot think such cases are within the provisions of sect. 641. Denials of equal rights in the action of the judicial tribunals of the State are left to the revisory powers of this court.

The assertions in the petition for removal, that the grand jury by which the petitioners were indicted, as well as the jury summoned to try them, were composed wholly of the white race, and that their race had never been allowed to serve as jurors in the county of Patrick in any case in which a colored man was interested, fall short of showing that any civil right was denied, or that there had been any discrimination against the defendants because of their color or race. The facts may have been as stated, and yet the jury which indicted them, and the panel summoned to try them, may have been impartially selected.

Nor did the refusal of the court and of the counsel for the prosecution to allow a modification of the *venire*, by which one-third of the jury, or a portion of it, should be composed of persons of the petitioners' own race, amount to any denial of a right secured to them by any law providing for the equal civil rights of citizens of the United States. The privilege for which they moved, and which they also asked from the prosecution, was not a right given or secured to them, or to any person, by the law of the State, or by any act of Congress, or by the Fourteenth Amendment of the Constitution. It *is* a right to which

every colored man is entitled, that, in the selection of jurors to pass upon his life, liberty, or property, there shall be no exclusion of his race, and no discrimination against them because of their color. But this is a different thing from the right which it is asserted was denied to the petitioners by the State court, viz. a right to have the jury composed in part of colored men. A mixed jury in a particular case is not essential to the equal protection of the laws, and the right to it is not given by any law of Virginia, or by any Federal statute. It is not, therefore, guaranteed by the Fourteenth Amendment, or within the purview of sect. 641.

It follows that the petition for a removal stated no facts that brought the case within the provisions of this section, and, consequently, no jurisdiction of the case was acquired by the Circuit Court of the United States. In the absence of such jurisdiction the writ of *habeas corpus*, by which the petitioners were taken from the custody of the State authorities, should not have been issued. The Circuit Court has now no authority to hold them, and they should be remanded.

Upon the question whether a writ of *mandamus* is a proper proceeding to enforce the return of the men indicted to the custody of the State authorities, little need be said, in view of former decisions of this court. Sect. 688 of the Revised Statutes enacts that the Supreme Court shall have power to issue . . . writs of *mandamus* in cases warranted by the principles and usages of law, to any courts appointed under the authority of the United States, or to persons holding office under the authority of the United States, where a State or an ambassador, or other public minister, or a consul or vice-consul, is a party. In what case such a writ is warranted by the principles and usages of law it is not always easy to determine. Its use has been very much extended in modern times, and now it may be said to be an established remedy to oblige inferior courts and magistrates to do that justice which they are in duty, and by virtue of their office, bound to do. It does not lie to control judicial discretion, except when that discretion has been abused; but it is a remedy when the case is outside of the exercise of this discretion, and outside the jurisdiction of the court or officer to which or to whom the writ is

addressed.  One of its peculiar and more common uses is to restrain inferior courts and to keep them within their lawful bounds.  Bacon's Abridgment, Mandamus, Letter D ; Tapping on Mandamus, 105 ; 3 Bl. Com. 110.  This subject was discussed at length in *Ex parte Bradley* (7 Wall. 364), and what was there said renders unnecessary any discussion of it now.  To that discussion we refer.  In our judgment it vindicates the use of a writ of *mandamus* in such a case as the present.

The writ will, therefore, be awarded ; and it is

*So ordered.*

Separate opinion of MR. JUSTICE FIELD, in which MR. JUSTICE CLIFFORD concurred.

I concur in the judgment of the court that the prisoners, Lee and Burwell Reynolds, must be returned to the officers of Virginia, from whose custody they were taken ; that the prosecution against them must be remanded to the State court from which it was removed ; and that a *mandamus* to the district judge of the Western District of Virginia is the appropriate remedy to effect these ends.  But as I do not agree with all the views expressed in the opinion of the court, and there are other reasons equally cogent with those given for the decision rendered, I deem it proper to state at length the grounds of my concurrence.

The prisoners were jointly indicted in a county court for the crime of murder.  They are colored men, and the person alleged to have been murdered was a white man.  On being arraigned they pleaded not guilty, and on their demand were remanded to the Circuit Court of the county for trial.  When brought before that court, at the April Term of 1878, they moved that the *venire* of jurors, then composed entirely of persons of the white race, should be modified so as to allow one-third of the *venire* to be composed of persons of their own race.  This motion was denied, on the ground that the court had no authority to change the *venire*, and that it satisfactorily appeared that the jurors had been regularly drawn from the jury-box according to law.  The accused then presented a petition for the removal of the prosecution to the Circuit Court

of the United States for the Western District of Virginia, setting forth the pendency of the criminal prosecution against them, and alleging, in substance, that rights, secured by the law providing for the equal civil rights of all citizens of the United States, were denied to them by the judicial tribunals of the county, inasmuch as their application for a mixed jury had been refused. It further alleged that a strong prejudice existed in the community of the county against them, independent of the merits of their case, on the ground that they were colored persons, and the one whom they were charged to have murdered was a white man; and that from this fact alone they were satisfied they could not obtain an impartial trial before a jury composed exclusively of persons of the white race.

The prayer of this petition was denied and the prisoners were tried separately and convicted of murder, one in the first and the other in the second degree. Both obtained new trials, one by the action of the court of original jurisdiction, and the other by that of the Court of Appeals on a writ of error.

At the October Term of 1878 they were a second time brought up for trial, and before the jury were impanelled again moved the court to remove the prosecution to the Circuit Court of the United States, upon the petition presented at the April Term; but the motion, as before, was denied. They were then tried separately. In one case, the jury disagreed, and the prisoner was remanded to jail to await another trial. In the other case, the prisoner was convicted of murder in the second degree, and his punishment was fixed by the jury at eighteen years' confinement in the penitentiary.

While the prisoners were held in jail, one of them to be again tried, and the other until he could be removed to the penitentiary under his sentence, they procured from the clerk of the court a copy of the record of the proceedings against them, which they presented to the Circuit Court of the United States for the Western District of Virginia, then held by Alexander Rives, the district judge, with the petition for removal presented to the State court, and prayed that the prosecutions should be there docketed and proceeded with. That court granted the petition, directed the cases to be placed

on its docket, and authorized the clerk to issue a writ of *habeas corpus cum causa* to the marshal of the district, requiring him to take the petitioners into his custody, and summon for their trial twenty-five jurors to attend at the next term of the court. A writ of *habeas corpus cum causa* was accordingly issued. Pursuant to its command, the prisoners were removed from the custody of the jailer and taken into the custody of the marshal. Thereupon the Commonwealth of Virginia presented a petition to this court praying for a writ of *mandamus* to be directed to the district judge, commanding him to order the marshal to redeliver the prisoners to her authorities, upon the ground that the judge in his proceedings had transcended the jurisdiction of his court, and undertaken the exercise of powers not vested by any law of the United States in him or the court held by him. Upon its presentation at the last term an order was issued to the judge to show cause why the writ should not issue as prayed. His return admits the facts as stated, and justifies his action on the ground that the refusal of the State court to set aside the *venire* summoned for the trial of the prisoners, and to give them a jury composed in part of their own race and color, was a denial to them of " the equal protec- tion of the laws," and brought their cases within the provisions of the Revised Statutes for the removal of criminal prosecu- tions from the State to the Federal courts. The Attorney- General of the Commonwealth contending that the return is insufficient to justify his action, now moves that the writ be issued as prayed.

The application of Virginia is resisted by a denial of the jurisdiction of this court to issue a writ to the district judge in the case ; a denial made not only by the counsel for the prisoners, who has been permitted to appear in their behalf, though the proceeding is one directly between the Common- wealth and the district judge, but by the Attorney-General, who has appeared, though not officially, for that officer. The ground of the denial is that the writ can be issued by this court only in the exercise or in aid of its appellate jurisdiction, and that the writ is here prayed in a proceeding which is not appellate but original, because it has its commencement in the presentation of the petition of the Commonwealth.

It is undoubtedly true that, except in cases where, under the Constitution, this court has original jurisdiction, the writ can be issued only in the exercise or in aid of its appellate authority. This was held as long ago as the case of *Marbury* v. *Madison*, decided in 1803, and the doctrine has been adhered to ever since; for the obvious reason that, the jurisdiction of the court being original in only a few enumerated cases, all exercise of power in other cases must be in virtue of its appellate jurisdiction. That jurisdiction may, however, be called into exercise in various ways. The term "appellate" in the Constitution is not used in a restricted sense, but in the broadest sense, as embracing the power to review and correct the proceedings of subordinate tribunals brought before it for examination in the modes provided by law. Congress has prescribed the mode or process by which such proceedings shall be brought before the court. In equity cases, it is by a simple notice that an appeal is taken from the decree or proceeding sought to be reviewed; in common-law cases, it is generally by writ of error; in some cases it is by a writ of prohibition, and in some by that of *certiorari*, or of *mandamus*. The mode is one resting entirely in the discretion of Congress. The Judiciary Act of 1789, passed at the first session of Congress after the adoption of the Constitution, declared that the Supreme Court should have appellate jurisdiction from the circuit courts and from courts of the several States in certain cases, and should " have power to issue writs of prohibition to the district courts, when proceeding as courts of admiralty and maritime jurisdiction, and writs of *mandamus* in cases warranted by the principles and usages of law, to any courts appointed or persons holding office under the authority of the United States."

In *Marbury* v. *Madison* it was held that the authority given by the act to issue the writ of *mandamus* to public officers was not warranted by the Constitution, the court observing that it was an essential criterion of appellate jurisdiction that it revises and corrects proceedings in a cause already instituted, and does not create the cause; and that although the writ might be directed to courts, yet to issue it to an officer for the delivery of a paper was in effect the same as to sustain

an original action for that paper; and, therefore, seemed to belong not to appellate, but to original jurisdiction. The case in which this language was used was an application to the court to compel Mr. Madison, then Secretary of State, to deliver to Mr. Marbury, as justice of the peace, a commission which had been signed by President Adams and transmitted to the predecessor in office of the Secretary, to be delivered to the appointee. There was, therefore, no action of an inferior tribunal brought up for review, the proceeding being merely to compel an executive officer to perform a ministerial act in which a citizen was interested. The language must, therefore, be limited by the facts of the case. It was not intended to deny the authority of this court to issue the writ to public officers, when the case is one in which it can exercise original jurisdiction; and probably to avoid such an inference the addition was made to the clause we have cited which now appears in the Revised Statutes, so as to allow the writ to issue to public officers only " where a State or an ambassador or other public minister or a consul or vice-consul is a party," — that is, in cases where the court has original jurisdiction. Indeed, it is only by such writ that the original jurisdiction of this court can in many cases be exercised. *Commonwealth of Kentucky* v. *Dennison,* 24 How. 66. Nor was the language intended to deny that this court can issue the writ to judicial officers where the object is to revise and correct their action in legal proceedings pending in the courts held by them. Though the writ to a subordinate or inferior court may be addressed to the court as such, it is usually directed to the judge thereof, or, if the court is composed of several judges, to such one or more of them as may be authorized to hold its sessions or participate in holding them. The reason assigned is that, in case of disobedience to the writ, the authority to enforce it is exercised over the judges personally who are vested with the power of exercising the functions of the court. High, Extraordinary Legal Remedies, sect. 275. In the present case, the writ is asked against the district judge who, whilst holding the Circuit Court of the Western District of Virginia, made the order which is the subject of complaint, and who, if the writ be granted, will be able to hold that court and carry out its command. There is no sound objection to its issue in this form.

The writ being one of the modes provided by Congress for the exercise of our appellate jurisdiction, the question whether it should be issued in this case is not difficult of solution if, as contended by the Commonwealth of Virginia, the Circuit Court, in taking the prisoners from the custody of her authorities, transcended its jurisdiction. To review that action and set aside what was done under it, the writ is sought. The jurisdiction invoked is, in its nature, appellate; and there is no other mode provided for its exercise in the case at bar than by the writ prayed. Though the petition is the first step taken by the Commonwealth against the judge, the proceeding is not on that account an original suit. The petition is merely the process by which our appellate jurisdiction is invoked.

It is well settled that the writ of *mandamus* will issue to correct the action of subordinate or inferior courts or judicial officers, where they have exceeded their jurisdiction, and there is no other adequate remedy. "It issues," says Blackstone, "to the judges of any inferior court, commanding them to do justice according to the powers of their office, whenever the same is delayed. For it is the peculiar business of the Court of King's Bench to superintend all inferior tribunals, and therein to enforce the due exercise of those judicial or ministerial powers with which the crown or the legislature have invested them; and this not only by restraining their excesses, but also by quickening their negligence and obviating the denial of justice." 3 Bl. Com. 110.

It is in accordance, therefore, with the principles and usages of law that this court should issue a *mandamus* in the cases here enumerated, and thus supervise the proceedings of inferior courts where there is a legal right and there is no other existing legal remedy. "It is upon this ground," says Mr. Justice Nelson, "that the remedy has been applied from an early day, — indeed, since the organization of courts and the admission of attorneys to practise therein down to the present time, — to correct the abuses of the inferior courts in summary proceedings against their officers, and especially against the attorneys and counsellors of the courts. The order disbarring them, or subjecting them to fine or imprisonment, is not reviewable by writ

of error, it not being a judgment in the sense of the law for which this writ will lie. Without, therefore, the use of the writ of *mandamus*, however flagrant the wrong committed against these officers, they would be destitute of any redress." *Ex parte Bradley*, 7 Wall. 364. See also *Ex parte Robinson*, 19 id. 505.

And so in the case at bar, without the use of this writ the greatest possible injury would be inflicted upon the Commonwealth of Virginia, without any redress, if the Circuit Court, as contended, transcended its jurisdiction. In no case, therefore, could the writ be more properly issued in the interests of justice, order, and good government. Nor was there any necessity for a previous demand upon that court, in the way of a motion to remand the prisoners. While the authorities, says Mr. High, in his valuable treatise on the law of *mandamus*, are not altogether reconcilable as to the necessity of a previous demand and refusal to perform the act which it is sought to coerce, a distinction is made between the cases where the duties to be enforced are of a public nature, affecting the public at large, and those where the duties are of a private nature, affecting only the rights of individuals. "And while," continues the author, "in the latter class of cases, where the person aggrieved claims the immediate and personal benefit of the act or duty whose performance is sought, demand and refusal are held to be necessary as a condition precedent to relief by *mandamus ;* in the former class, the duty being strictly of a public nature, not affecting individual interests, and there being no one specially empowered to demand its performance, there is no necessity for a literal demand and refusal. In such cases the law itself stands in lieu of a demand, and the omission to perform the required duty in place of a refusal." Extraordinary Legal Remedies, sect. 13.

In this case not only was the duty required of the Circuit Court one of a public nature, in which the Commonwealth of Virginia is interested, but it would have been a useless ceremony to move for an order remanding the prisoners to her authorities, in the face of its direction to the marshal to take them into custody, and its order to docket and proceed with the prosecution against them in the Circuit Court of the United

States, and the justification of this action contained in the return of the judge.

The preliminary objections to the exercise of our jurisdiction being disposed of, we are brought to the important inquiry, whether the action of the Circuit Court, in taking the prisoners from the custody of the authorities of Virginia, was authorized under the laws of the United States. The *mandamus* prayed is to compel the return of the prisoners, as already stated; but the validity of the order directing the marshal to take them into his custody depends upon the legality of the removal of the prosecution from the State to the Federal court. The order to the marshal was the necessary sequence of assuming jurisdiction of the prosecution. The legality of the removal is, therefore, the question for determination. Its legality is denied by Virginia on two grounds: 1st, that the act of Congress (Rev. Stat., sect. 641), upon the provisions of which the respondent relies, does not authorize the removal; and, 2d, that the act, in authorizing a criminal prosecution for an offence against a law of the State to be, before trial, removed from a State court to a Federal court, is unconstitutional and void. In my opinion, both of these grounds are well taken.

Sect. 641 of the Revised Statutes, re-enacting provisions of previous statutes, in terms provides in certain cases for the removal to the circuit courts of the United States of criminal prosecutions commenced in a State court. It declares that " when any civil suit or criminal prosecution is commenced in any State court, for any cause whatsoever, against any person who is denied or cannot enforce in the judicial tribunals of the State, or in any part of the State where such suit or prosecution is pending, any right secured to him by any law providing for the equal rights of citizens of the United States, or of all persons within the jurisdiction of the United States, or against any officer, civil or military, or other person, for any arrest or imprisonment or other trespass, or wrongs, made or committed by virtue of or under color of authority derived from any law providing for equal rights as aforesaid, or for refusing to do any act on the ground that it would be inconsistent with such law, such suit or prosecution may, upon the petition of such defendant filed in said State court, at any time before the trial

or final hearing of the cause, stating the facts and verified by oath, be removed for trial into the next circuit court to be held in the district where it is pending. Upon the filing of such petition all further proceedings in the State courts shall cease." The section also provides for furnishing the Circuit Court with copies of the process, pleadings, and proceeding of the State court. A subsequent section provides for the issue in such cases of a writ of *habeas corpus cum causa* to remove the accused, when in actual custody upon process of the State court, to the custody of the marshal of the United States.

By this enactment it appears that, in order to obtain a removal of a prosecution from a State to a Federal court, — except where it is against a public officer or other person for certain trespasses or conduct not material to consider in this connection, — the petition of the accused must show a denial of, or an inability to enforce in the tribunals of the State, or of that part of the State where the prosecution is pending, some right secured to him by the law providing for the equal rights of citizens or persons within the jurisdiction of the United States. But how must the denial of a right under such a law, or the accused's inability to enforce it in the judicial tribunals of the State, be made to appear? So far as the accused is concerned, the law requires him to state and verify the facts, and from them the court will determine whether such denial or inability exists. His naked averment of such denial or inability can hardly be deemed sufficient; if it were so, few prosecutions would be retained in a State court for insufficient allegations when the accused imagined he would gain by the removal. *Texas* v. *Gaines*, 2 Woods, 344. There must be such a presentation of facts as to lead the court to the conclusion that the averments of the accused are well founded. There are many ways in which a person may be denied his rights, or be unable to enforce them in the tribunals of a State. The denial or inability may arise from direct legislation, depriving him of their enjoyment or the means of their enforcement, or discriminating against him or the class, sect, or race to which he belongs. And it may arise from popular prejudices, passions, or excitement, biassing the minds of jurors and judges. Relig-

ious animosities, political controversies, antagonisms of race, and a multitude of other causes will always operate, in a greater or less degree, as impediments to the full enjoyment and enforcement of civil rights. We cannot think that the act of Congress contemplated a denial of, or an inability to enforce, one's rights from these latter and similar causes, and intended to authorize a removal of a prosecution by reason of them from a State to a Federal court. Some of these causes have always existed in some localities in every State, and the remedy for them has been found in a change of the place of trial to other localities where like impediments to impartial action of the tribunals did not exist. The Civil Rights Act, to which reference is made in the section in question, was only intended to secure to the colored race the same rights and privileges as are enjoyed by white persons: it was not designed to relieve them from those obstacles in the enjoyment of their rights to which all other persons are subject, and which grow out of popular prejudices and passions.

The denial of rights or the inability to enforce them, to which the section refers, is, in my opinion, such as arises from legislative action of the State, as, for example, an act excluding colored persons from being witnesses, making contracts, acquiring property, and the like. With respect to obstacles to the enjoyment of rights arising from other causes, persons of the colored race must take their chances of removing or providing against them with the rest of the community.

This conclusion is strengthened by the provisions of the Fourteenth Amendment to the Constitution. The original Civil Rights Act was passed, it is true, before the adoption of that amendment; but great doubt was expressed as to its validity, and to obtain authority for similar legislation, and thus obviate the objections which had been raised to its first section, was one of the objects of the amendment. After its adoption the Civil Rights Act was re-enacted, and upon the first section of that amendment it rests. That section is directed against the State. Its language is that "*no State* shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall *any State* deprive any person of life, liberty, or property without due

process of law, nor deny to any person within its jurisdiction the equal protection of the laws." As the State, in the administration of its government, acts through its executive, legislative, and judicial departments, the inhibition applies to them. But the executive and judicial departments only construe and enforce the laws of the State; the inhibition, therefore, is in effect against passing and enforcing any laws which are designed to accomplish the ends forbidden. If an executive or judicial officer exercises power with which he is not invested by law, and does unauthorized acts, the State is not responsible for them. The action of the judicial officer in such a case, where the rights of a citizen under the laws of the United States are disregarded, may be reviewed and corrected or reversed by this court: it cannot be imputed to the State, so as to make it evidence that she in her sovereign or legislative capacity denies the rights invaded, or refuses to allow their enforcement. It is merely the ordinary case of an erroneous ruling of an inferior tribunal. Nor can the unauthorized action of an executive officer, impinging upon the rights of the citizen, be taken as evidence of her intention or policy so as to charge upon her a denial of such rights.

If these views are correct, no cause is shown in the petition of the prisoners that justified a removal of the prosecutions against them to the Federal court. No law of Virginia makes any discrimination against persons of the colored race, or excludes them from the jury. The law respecting jurors provides that "all male citizens, twenty-one years of age and not over sixty, who are entitled to vote and hold office under the Constitution and laws of the State," with certain exemptions not material to the question presented, may be jurors; and it authorizes an annual selection in each county, by the county judge, from the citizens at large, of from one to three hundred persons, whose names are to be placed in a box, and from them the jurors, grand and petit, of the county are to be drawn. There is no restriction placed upon the county judge in selecting them, except that they shall be such as he shall think "well qualified to serve as jurors, being persons of sound judgment and free from legal exception." The mode thus provided, properly carried out, cannot fail to secure competent jurors.

Certain it is that no rights of the prisoners are denied by this legislation. The application to the State court, upon the refusal of which the petition was presented, was for a *venire* composed of one-third of their race, — a proceeding wholly inadmissible in any jury system which obtains in the several States.

From the return of the district judge it would seem that in his judgment the presence of persons of the colored race on the jury is essential to secure to them the " equal protection of the laws; " but how this conclusion is reached is not apparent, except upon the general theory that such protection can only be afforded to parties when persons of the class to which they belong are allowed to sit on their juries. The correctness of this theory is contradicted by every day's experience. Women are not allowed to sit on juries; are they thereby denied the equal protection of the laws? Foreigners resident in the country are not permitted to act as jurors, yet they are protected in their rights equally with citizens. Persons over sixty years of age in Virginia are disqualified as jurors, yet no one will pretend that they do not enjoy the equal protection of the laws. If when a colored person is indicted for a criminal offence it is essential, to secure to him the equal protection of the laws, that persons of his race should be on the jury by which he is tried, it would seem that the presence of such persons on the bench should be equally essential where the court consists of more than one judge; and that if it should consist of only a single judge, such protection would be impossible. To such an absurd result does the doctrine lead, which the Circuit Court announced as controlling its action.

The equality of protection assured by the Fourteenth Amendment to all persons in the State does not imply that they shall be allowed to participate in the administration of its laws, or to hold any of its offices, or to discharge any duties of a public trust. The universality of the protection intended excludes any such inference. Were this not so, aliens resident in the country, or temporarily here, of whom there are many thousands in each State, would be without that equal protection which the amendment declares that no State shall deny to any person within its jurisdiction.

It follows from these views as to the meaning and purpose
of the act of Congress that the removal of the prosecution in
this case from the State to the Federal court is unauthorized
by it; and that the order of the Circuit Court to the marshal
to take the prisoners from the custody of the State authorities
is illegal and void.

The second objection of the Commonwealth to the legality
of the removal is equally conclusive. The prosecution is for
the crime of murder, committed within her limits, by persons
and at a place subject to her jurisdiction. The offence charged
is against her authority and laws, and she alone has the right
to inquire into its commission, and to punish the offender.
Murder is not an offence against the United States, except
when committed on an American vessel on the high seas, or in
some port or haven without the jurisdiction of the State, or
in the District of Columbia, or in the Territories, or at other
places where the national government has exclusive jurisdic-
tion. The offence within the limits of a State, except where
jurisdiction has been ceded to the United States, is as much
beyond the jurisdiction of these courts as though it had been
committed on another continent. The prosecution of the
offence in such a case does not, therefore, arise under the Con-
stitution and laws of the United States; and the act of Congress
which attempts to give the Federal courts jurisdiction of it is,
to my mind, a clear infraction of the Constitution. That
instrument defines and limits the judicial power of the United
States.

It declares, among other things, that the judicial power shall
extend to cases in law and equity arising under the Constitu-
tion, laws, and treaties of the United States, and to various
controversies to which a State is a party; but it does not
include in its enumeration controversies between a State and
its own citizens. There can be no ground, therefore, for the
assumption by a Federal court of jurisdiction of offences
against the laws of a State. The judicial power granted by
the Constitution does not cover any such case or controversy.
And whilst it is well settled that the exercise of the power
granted may be extended to new cases as they arise under the
Constitution and laws, the power itself cannot be enlarged by

Congress. The Constitution creating a government of limited powers puts a bound upon those which are judicial as well as those which are legislative, which cannot be lawfully passed.

This view would seem to be conclusive against the validity of the attempted removal of the prosecution in this case from the State court. The Federal court could not in the first instance have taken jurisdiction of the offence charged, and summoned a grand jury to present an indictment against the accused; and if it could not have taken jurisdiction at first, it cannot do so upon a removal of the prosecution to it. The jurisdiction exercised upon the removal is original and not appellate, as is sometimes erroneously asserted; for, as stated by Chief Justice Marshall in *Marbury* v. *Madison*, already cited, it is of the essence of appellate jurisdiction that it revises and corrects proceedings already had. The removal is only an indirect mode by which the Federal court acquires original jurisdiction. *Railway Company* v. *Whitton*, 13 Wall. 270.

The Constitution, it is to be observed, in the distribution of the judicial power, declares that in the cases enumerated in which a State is a party the Supreme Court shall have original jurisdiction. Its framers seemed to have entertained great respect for the dignity of a State which was to remain sovereign, at least in its reserved powers, notwithstanding the new government, and therefore provided that when a State should have occasion to seek the aid of the judicial power of the new government, or should be brought under its subjection, that power should be invoked only in its highest tribunal. It is difficult to believe that the wise men who sat in the convention which framed the Constitution and advocated its adoption ever contemplated the possibility of a State being required to assert its authority over offenders against its laws in other tribunals than those of its own creation, and least of all in an inferior tribunal of the new government. I do not think I am going too far in asserting that had it been supposed a power so dangerous to the independence of the States, and so calculated to humiliate and degrade them, lurked in any of the provisions of the Constitution, that instrument would never have been adopted.

There are many other difficulties in maintaining the position

of the Circuit Court, which the counsel of the accused and the Attorney-General have earnestly defended. If a criminal prosecution of an offender against the laws of a State can be transferred to a Federal court, what officer is to prosecute the case? Is the attorney of the Commonwealth to follow the case from his county, or will the United States district attorney take charge of it? Who is to summon the witnesses and provide for their fees? In whose name is judgment to be pronounced? If the accused is convicted and ordered to be imprisoned, who is to enforce the sentence? If he is deemed worthy of executive clemency, who is to exercise it, — the Governor of the State, or the President of the United States? Can the President pardon for an offence against the State? Can the Governor release from the judgment of a Federal court? These and other questions which might be asked show, as justly observed by the counsel of Virginia, the incongruity and absurdity of the attempted proceeding.

Undoubtedly, if in the progress of a criminal prosecution, as well as in the progress of a civil action, a question arise as to any matter under the Constitution and laws of the United States, upon which the defendant may claim protection, or any benefit in the case, the decision thereon may be reviewed by the Federal judiciary, which can examine the case so far, and so far only, as to determine the correctness of the ruling. If the decision be erroneous in that respect, it may be reversed and a new trial had. Provision for such revision was made in the twenty-fifth section of the Judiciary Act of 1789, and is retained in the Revised Statutes. That great act was penned by Oliver Ellsworth, a member of the convention which framed the Constitution, and one of the early chief justices of this court. It may be said to reflect the views of the founders of the Republic as to the proper relations between the Federal and State courts. It gives to the Federal courts the ultimate decision of Federal questions, without infringing upon the dignity and independence of the State courts. By it harmony between them is secured, the rights of both Federal and State governments maintained, and every privilege and immunity which the accused could assert under either can be enforced.