The defendant was found guilty by a jury of the crime of burglary in the third degree in violation of General Statutes53a-103.[2] In this appeal from the judgment the only error relied upon is the denial by the court of a challenge to the array of jurors which the defendant made before trial. He claims that the system used for selecting the array from which the petit jury for this case was drawn violated his state and federal constitutional right to a trial before a jury chosen from a fair cross-section of the community. In particular, he maintains that the *Page 408 
statutory[3] exemption from jury service given to women in certain situations or occupations has continually resulted in a significant underrepresentation of women on the jury. An additional claim is made that the practice followed by the jury commissioners for New Haven County of excluding teachers, students and clergymen from jury service, without their requesting to be excused, also has deprived the defendant of his right to a trial before a jury selected from a fair cross-section.
For the purpose of expeditiously deciding the defendant's challenge to the array it was stipulated that the same evidence which had been presented in another case,[4] where a similar challenge had been made to the same array of jurors, would be relied upon. The transcript of that evidence, which was under preparation at the time the present challenge was heard, was never presented to the trial court nor has it been filed in this appeal. Numerous exhibits from the other case were filed and counsel for the defendant orally summarized some of the testimony. The court, nevertheless,[5] made a finding substantially *Page 409 
as follows: The subject of the defendant's challenge was the list of names submitted by the New Haven County jury commissioners for jury service during the year beginning September 1, 1975. The census data available indicated that 54 percent of the population in New Haven County who had reached the age of twenty-one years[6] were women of the persons whose names were submitted by the jury committees of each town in the county to the jury commissioners for jury service in accordance with General Statutes 51-221, 48 percent were women and 52 percent were men. After the jury commissioners had performed their function of erasing the names of those not qualified to serve and enough other names to reduce the total by one-half, as required by51-223, the resulting list was composed of 39 percent women and 61 percent men. The jury commissioners accepted for inclusion on their list only 47 percent of the female names in comparison to 70 percent of the male names submitted to them as prospective jurors for the year beginning September 1, 1975. For the preceding year an exhibit introduced in evidence indicated that 41 percent of the female names and 75 percent of the male names were accepted.[7]
The parties stipulated that it was the policy of the New Haven County jury commissioners in selecting the jury array to exclude all students, teachers, and clergymen on the basis of their occupations. The information concerning occupations was obtained from *Page 410 
the responses to the questionnaires which the jury commissioner sent to each person on the list submitted by the jury committee of each town.
It is not entirely self-evident that a man found guilty by a jury should be able to overturn that result upon the ground that the array of jurors at a certain stage of the jury selection procedure included too few women, especially when the jury which decided his case appears to have been comprised of almost twice as many women as men.[8] Similarly, the record contains no indication that the defendant was a teacher, student, or clergyman, or that in some manner the defendant was prejudiced by the absence from the jury array of persons in those occupations. Some explanation of where we are and how we got here must be attempted.
The early challenges to jury composition were made by defendants who claimed that the procedure used for selecting grand or petit jurors discriminated against members of their race in violation of the fourteenth amendment guaranty of equal protection of the laws. Neal v. Delaware,103 U.S. 370, 394, 26 L.Ed. 567 (1880); Strauder v. West Virginia, 100 U.S. 303, 309, 25 L.Ed. 664
(1879); Virginia v. Rives, 100 U.S. 313, 321,25 L.Ed. 667 (1879). In order to make such a claim it was considered essential that the person asserting the denial of equal protection belong to the excluded class. Fay v. New York, 332 U.S. 261,287, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); Rawlins v. Georgia, 201 U.S. 638, 640, 26 S.Ct. 560,50 L.Ed. 899 (1906). After it was held in Duncan v. Louisiana,391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), that the due process clause of the fourteenth amendment made the right of jury trial in the sixth amendment binding upon the states, the emphasis shifted to the requirement that the jury be selected from a *Page 411 
"cross-section of the community," a standard previously established in the federal courts. Ballard v. United States, 329 U.S. 187, 193,67 S.Ct. 261, 91 L.Ed. 181 (1946); Thiel v. Southern Pacific Co., 328 U.S. 217, 220, 66 S.Ct. 984,90 L.Ed. 1181 (1946). Since discrimination against any significant group of people would detract from the representative character of the jury array and, presumably,[9] would be reflected in the composition of the jury ultimately selected, tainting its sociological purity, it was no longer deemed necessary that the party raising the challenge belong to the class involved. Peters v. Kiff, 407 U.S. 493, 504, 92 S.Ct. 2163,33 L.Ed.2d 83 (1972). This rationale for departing from orthodox notions of standing and aggrievement would be incomplete without acknowledging that, in addition to the traditional concern for protection of the rights of the individual litigant, these cases have presented an important vehicle for advancing the rights of various groups which have been the subject of unlawful discrimination. It is clear, therefore, that this defendant may question the composition of the jury array on the ground that women, teachers, students, and clergymen were not fairly represented, although it does not appear that he is a member of any of those groups and there is no reason to suppose that representatives of these groups upon the jury would have been more favorably inclined toward him. Taylor v. Louisiana, 419 U.S. 522, 526,95 S.Ct. 692, 42 L.Ed.2d 690 (1975). *Page 412 
The American tradition that the jury, as an instrument of public justice, should be truly representative is the basis for the constitutional requirement that the jury array reflect a cross-section of the community from which no cognizable group of citizens has been systematically excluded. Taylor v. Louisiana, supra, 527; State v. Townsend, 167 Conn. 539, 546, 356 A.2d 125, cert. denied, 423 U.S. 846, 96 S.Ct. 84,46 L.Ed.2d 67 (1975). The defendant claims to have proved a prima facie case of a violation of this requirement which the state never refuted. "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664,58 L.Ed.2d 579 (1979).
With reference to the claim of systematic exclusion of women, it is well established that females constitute a distinctive group entitled to adequate representation on the jury array. Duren v. Missouri, supra; Taylor v. Louisiana, Supra, 531. Although there have been skeptics,[10]
highest legal authority has declared that males and females are not fungible as jurors, because women bring a certain "flavor" to the adjudicative process of which no person accused of a crime may be lawfully deprived. Ballard v. United States, 329 U.S. 187, 193-94, 67 S.Ct. 261,91 L.Ed. 181 (1946). *Page 413 
It is not disputed that the evidence established a difference of 9 percent between the proportion of women on the list of jurors submitted to the jury commissioners and that on the list which was filed with the court for service during the year beginning September 1, 1975. The difference between the list filed with the court and the proportion of women in the population of the county was 15 percent. This greater discrepancy does not concern us directly, because the defendant in this appeal makes no claim of systematic exclusion against the jury committees of the towns, which submitted lists containing only 48 percent women as compared with 54 percent women in the county population.[11] See Newman v. Henderson, 539 F.2d 502, 504-505 (5th Cir. 1976). We are concerned here only with the difference between the representation of women on the town committee lists (48 percent) and on the list eventually submitted to the court by the jury commissioners (39 percent), a total disparity of 9 percent.[12]
It has never been held that the fair-cross-section requirement has not been fulfilled because the jury array did not precisely mirror the sociological composition of the community. Swain v. Alabama, 380 U.S. 202, 208, 85 S.Ct. 824,13 L.Ed.2d 759 (1965). Representation of the group or class on the jury array need not be mathematically proportionate but only "fair and reasonable." Duren v. Missouri, supra, 364. We are not aware of any case holding that a 9 percent underrepresentation of a particular group was sufficient to prove that the array was fatally tainted by discrimination. In cases where sex discrimination has been found, the statistical disparity in the representation *Page 414 
of women on the array has been extreme. Ibid. (54 percent women in population of area, 26.7 percent women summoned for jury service, 14.5 percent women in jury pool); Taylor v. Louisiana, supra, 524 (53 percent women in population of area, less than 10 percent women in jury pool). Such claims have been rejected where the disproportion was greater than that found here. United States v. Butera, 420 F.2d 564, 571 (1st Cir. 1970); (52 percent women in population of area, 36 percent women in jury pool); United States v. DiTommaso, 405 F.2d 385, 388 (4th Cir. 1968), cert. denied, 394 U.S. 934, 89 S.Ct. 1209,22 L.Ed.2d 465 (1969) (52.1 percent women in population of area, 29 percent women in jury pool); United States v. Bryant, 291 F. Sup. 542,550 (D. Me. 1968) (52 percent women in population of area, 36.1 percent to 37.8 percent women in jury pools). In the federal courts a deviation of 10 percent has been regarded as a benchmark for permissible underrepresentation of a cognizable group on the jury array, at least where the jury selection procedure was basically neutral and in the absence of proof of purposeful discrimination. swain v. Alabama, supra, 209; Foster v. Sparks,506 F.2d 805, 828 (5th Cir. 1975).
The defendant claims that a prima facie case may be established by showing the existence over a significant period of time of a persistent disparity of any degree between representation of the group on the list of jurors drawn for service and in the jury pool. Our examination of the cases relied upon lends little support for this proposition. See Castaneda v. Partida, 430 U.S. 482,495, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (79.1 percent Mexican-Americans in population of area, only 39 percent Mexican-Americans summoned for grand jury service); Newman v. Henderson,539 F.2d 502, 504 (5th Cir. 1976) (31.9 percent blacks in population of area eligible for jury service, 13 percent blacks called for jury service). A "substantial underrepresentation" of the *Page 415 
particular group must be demonstrated in order to make out a prima facie case. Castaneda v. Partida, supra, 494. In this case the defendant's statistical evidence is insufficient to satisfy this requirement.
In order to prove that the underrepresentation of women arises from the "systematic" exclusion of the group in the jury-selection process, the defendant points to the existence of General Statutes 51-218 (Rev. to 1975) which, at the time the jury array involved here was chosen, created an exemption from jury service for "any woman who is a trained nurse in active practice, an assistant in a hospital or an attendant nurse, or who is nursing a sick member of her family, or who has care of one or more children under the age of sixteen years. Article fifth of the Connecticut constitution, which made discrimination because of sex a denial of equal protection of the laws,[13]
was adopted on November 27, 1974. The sex oriented occupational exemptions created by 51-218
would clearly fall within the prohibition of the amendment. The legislature recognized the effect of this constitutional change by repealing[14]51-218 at the next session and by amending[15]
51-219 to make substantially the same occupational exemptions as those previously contained in 51-218 applicable to both sexes.
There is nothing in the record before us to indicate that the sex orientation of the occupational exemptions created by 51-218 had any influence upon the composition of the jury array which began service of September 1, 1975, even though the repeal of that statute did not become effective until October, 1975. The finding is silent upon this matter and the defendant *Page 416 
has chosen not to file a transcript of the evidence in the earlier case, which was stipulated to be the basis for determining the issues in the present case. See Practice Book, 1963, 960. The memorandum of decision in the earlier case was presented to the trial court, however, and has been included as part of the record before us. Practice Book 3080. The memorandum states that there was evidence that "at least 40 men who sought exemption because they had the care of children under sixteen or of a sick family member, or were nurses or assistants in hospital, were excused," and that there was no evidence that any men who requested such an exemption were refused. We may assume the accuracy of this recital, because it has not been challenged and because the defendant himself presented the memorandum to the court as part of his summary of what had transpired in the earlier case. Although the defendant would prefer to rest upon the finding rather than the evidence at this stage of the proceeding, to determine whether a prima facie case has been made out requires an examination of the evidence. A prima facie case is established only when the evidence indicates to a reasonable person such a strong probability of the fact at issue that some explanation or contradiction is reasonably called for. State v. Lenihan, 151 Conn. 552,555, 200 A.2d 476 (1964); State v. Nelson,139 Conn. 124, 127, 90 A.2d 157 (1952). The evidence that the jury commissioners made the occupational exemptions of 51-218 available to men as well as women makes it unnecessary for us to indulge in the presumption that as public officials they performed their duties properly; State v. Lenihan, supra, 555; and ignored the sex discrimination feature of the statute, which had been superseded by [he adoption of the amendment to the state constitution. It is clear that the sex preference aspect of the statute, which the defendant has relied upon to prove "systematic" underrepresentation of women, had no effect upon the jury commissioners in selecting the array. *Page 417 
Since the responsibility for the care of minor children in our society is still usually fulfilled by the mother, it is obvious that even a facially neutral statutory exemption upon this ground would have some effect upon the sexual composition of the jury pool. Other exemptions, such as those for nurses, policemen, firemen, attorneys, physicians, or members of the militia, are likely to have a similar effect, because unequal proportions of men or women have chosen those occupations. It has been expressly recognized that "a State may have an important interest in assuring that those members of the family responsible for the care of children are available to do so" and that "[a]n exemption appropriately tailored to this interest would . . . survive a fair-cross-section challenge." Duren v. Missouri, 439 U.S. 357, 370,99 S.Ct. 664, 58 L.Ed.2d 579 (1979).
We conclude, therefore, that the defendant has failed to make out a prima facie case of systematic exclusion of women from the jury array, (1) because the statistical discrepancy relied upon falls short of the benchmark necessary to prove substantial under-representation of that group; and (2) because the features of the jury selection process alleged to have produced the discrepancy are in their terms and application neutral between sexes and are reasonably related to the protection of justifiable social interests.
 II
The claim of the defendant that the automatic exclusion of teachers, clergymen, and students[16]
by the jury commissioners violated the fair-cross-section requirement is not supported by any evidence of the proportion of persons in those occupations in the general population or on the lists submitted by the *Page 418 
jury committees of the towns within the county. Without such data it would not be possible to determine whether the absence of such persons would have any significant effect upon the composition of the jury array. See State v. Brown,169 Conn. 692, 699, 364 A.2d 186 (1975); State v. Townsend, 167 Conn. 539, 552, 356 A.2d 125, cert. denied, 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67
(1975). It also is not clear that these groups are the subject of such a distinct set of community attitudes as to be "cognizable" for the purpose of representation on the jury array. See Hernandez v. Texas, 347 U.S. 475, 479,74 S.Ct. 667, 98 L.Ed. 866 (1954); Foster v. Sparks, 506 F.2d 805,819-21 (5th Cir. 1975). Exemptions for clergymen, teachers, and students may be justified upon the ground that it is "for the good of the community that their regular work should not be interrupted . . . ." Rawlins v. Georgia, 201 U.S. 638,640, 26 S.Ct. 560, 50 L.Ed. 899 (1906). "It would not appear that such exemptions would pose substantial threats that the remaining pool of jurors would not be representative of the community." Duren v. Missouri, supra, 370; Taylor v. Louisiana,419 U.S. 522, 534, 95 S.Ct. 692, 42 L.Ed.2d 690
(1970). There is no evidence in this case to indicate that the absence of teachers, clergymen, or students rendered the jury array nonrepresentative.
Regardless of the effect upon the fair-cross-section requirement, the deliberate exclusion of particular groups, as practiced by the jury commissioners, would form the basis for a claim of a violation of the right of equal protection of the laws. Cassell v. Texas, 339 U.S. 282, 286, 70 S.Ct. 629, 94 L.Ed. 839
(1950). The defendant is not entitled, however, to raise such a claim, because it does not appear that he is a member of any of the groups involved. Alexander v. Louisiana, 405 U.S. 625, 633,92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); Fay v. New York, 332 U.S. 261,287, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); *Page 419 
Rawlins v. Georgia, supra, 640. The defendant himself would not have been denied equal protection of the laws by the exclusion of teachers, clergymen, or students unless he were a member of one of those groups. Alexander v. Louisiana, supra.
 There in no error.
In this opinion A. HEALEY and PARSKEY, Js., concurred.