Mr. Justice James
delivered the opinion of the Court:
This is a petition for a writ of mandamus, commanding the Commissioners of the District of Columbia to approve and issue, or cause to bo issued to the relators, a retail liquor license applied for by them as stated in their relation.
The relators state that about the 10th day of November, 1888, they obtained a lease of the building in Washington, known as the Globe Theater; that the premises, as they are informed, have been used as a theater and place of public amusement almost continuously for nearly thirty years; *101 that during almost that entire period a bar has been used in said building, or in conjunction with said theater, for the accommodation of persons who have “patronized” that place of amusement; and that a bar is a necessary convenience for the public, including such patrons, and that without a bar the building is of little or no value as a theater, and cannot be successfully used as such ; that they have expended more than $3,000 in improvements, and ,by successful management of the theater and its bar and cafe, have secured a goodwill worth $3,000more; that during thepreceding license year they have had a theater license, an eating-house license, and a bar-room license, and now desire to continue their business. They then state certain conduct of Lieutenant Amiss, of the Metropolitan Police, alleged to be officious and malicious, and intended to prevent them from obtaining a theater license, but that, on appeal to the Commissioners, they did obtain such license, and, upon its expiration, a new license, which will not expire until October 31, 1890; and that in December, 1888, they obtained a bar-room license for the first story east room of said building, which expired on 31st of October, 1889.
They then state certain further conduct of Lieutenant Amiss, alleged to be “ unlawful, oppressive, unwarrantable and officious,” and intended to destroy their business; such conduct consisting of a charge, uttered in their bar-room, in a loud and boisterous voice, and in presence of divers persons employed in their theater, to the effect that the relators had kept a bawdy-house in Philadelphia and were trying to run one here. Denying that charge, they state that, at their request, the chief of police had made a complete inspection of their building and that they understood him to be entirely satisfied with the construction and management of the theater and bar-rooms; and further that, about the same time, they requested the chief of police and Lieutenant Amiss to notify them of any objectionable feature in the management of their building which might come to *102 the hearing of those officers, promising to correct the same; but that, although it was the custom of the police officers on duty in that square to walk through and inspect the premises, the relators had not, prior to the 31st day of October, received any notice of disapproval.
They then state their proceedings in applying for the license now in question, and that the Commissioners disapproved and rejected their application, in consequence of an adverse report made to them by Lieutenant Amiss. This report is made a part of relator’s petition. It contained, among others, the following questions and answers:
“Q. 3. Are the premises the resort of disreputable, vicious, or disorderly character's? If so, state the particulars.
“A. There are almost continuously an idle, suspicious crowd hanging in and about this place. There has in the last license year been several reports of robberies from the person, occurring on the premises controlled by the applicants.” * * *
“Make any general remarks tending to inform the Commissioners of the District as to the propriety of granting this application.
“A. This bar is frequented by young men who go there apparently after the female actors, who enter the bar from the back or stage entrance. This place is frequented by thieves and suspicious people. In the past year there has been several robberies from the person reported from this place. Under the circumstances I feel that it is my duty to suggest that this license be not granted.”
The relators deny any knowledge that thieves or suspicious persons frequented the premises, or that robberies were committed there, and aver 'that Lieutenant Amiss’s report shows that he had neglected his duty in not protecting them from such persons, and that relators had never received any notice of such frequenters or such robberies from the police force. They aver that their female actors are not allowed to remain in or frequent the bar-room, and *103 that the general management of their theater, bar and cafe, as well as to the conduct of persons who visit the same, has been lawful, orderly and decent. Then' they state in detail further instances of alleged misconduct of Lieutenant Amiss.
They make part of their petition the rules and regulations of the Commissioners in regard to the granting of liquor licenses, and aver that they do not come within the rules which declare that “a license will not be granted to any person convicted during the preceding license year of selling liquor on Sunday, and to any person keqpingya place where idle, noisy, disorderly or suspicious characters congregate.” They also make part of their petition an answer under oath,, which they filed with the Commissioners, denying the statements contained in the said police report of Lieutenant Amiss, and now aver that no evidence under oath tending to prove the truth of said charges, was ever presented, or was ever before, the Commissioners, and that the Commissioirers neglected and refused to require the said Amiss to prove the truth of any of the charges contained in his report, although such proof was demanded by the relators, and that the Commissioners decided to deny the relators said license, without any evidence in support of said report. They further aver that the Commissioners have arbitrarily discriminated against the relators and in favor of the proprietors of the bars located in Kornan’s Washington Theater and in the New National Theater, for that— as they aver on information and belief — the proprietors of each of those bars have, as the defendants well know, been convicted of selling liquor on Sundays during the preceding license year, while the relators have never been convicted in this District of any offense whatever. And, finally, they set forth circumstances intended to show that Lieutenant Amiss is the friend of the proprietor of Neman’s Theater, and has acted with a view to favor said place of amusement, and to give notice to the public that it was under his special care and protection.
*104 We have recited, though with abbrevation, everything that claimed to be an. averment of fact in this petition, in order to a consideration of the questions said at the argument to be involved in this case. Before we proceed to the return, we may observe at once that the petition does not pretend to connect the respondents witli the improprieties charged against Lieutenant Amiss, and that these charges are irrelevant to this case. Nor does the petition aver that the respondents disapproved the application for license without making any examination for themselves. On the contrary, it shows affirmatively that their decision ivas reached after consideration and some kind of examination. It substantially avers, however, that they relied upon evidence which it was unreasonable to trust. And, finally, it avers and complains that the respondents refused to hear an issue as to the truth of the evidence furnished to them by their inferior officers, whom they had required to report to them.
It is unnecessary to state the contents of the return so fully as we have those of the petition. It denies that a bar has been in use in said building, in conjunction with the theater, for nearly thirty years, and states, on the contrary, that the records of the Commissioners’ office show that, during the eight years ending October 31, 1888, said building was licensed and occupied as a theater without a liquor license. It admits that an application for a retail liquor license for the year commencing November 1, 1889, was made as averred in the petition, and that all of the preliminary forms and steps required by the laws and ordinances of the District were complied with. As to their disapproval, respondents return as follows : “ The application of the petitioners for a license was disapproved for the reasons, among others, given in the report of Lieutenant T. B. Amiss, in charge of the police precinct in which the petitioners’ premises are located. * * * Whilst said report had its influence with these respondents, they did *105 not finally act upon it until one of their number, Henry M. Robert, had made a personal inspection of the premises ■of the petitioners, to inform himself of the fairness of the report; and to aid the respondents in acting intelligently and justly in the performance of a public duty. It was not until the respondent Robert had made such personal inspection, which was made whilst the theater and bar were In operation, and reported the result to his associates, that the respondents considered that the public interests required that they should deny the application of the petitioners, and when in fact they did deny it.”
They decline to answer paragraphs 12-24 as being irrelevant to the matter in question, and say : “ On information :and belief, however, we aver that the petitioners do not keep an orderly and well-disposed place ; that their theater is frequented by thieves and idle and vicious persons; that many complaints have been made to the police department by persons who have been robbed there; that many complaints have been lodged by persons who have been assaulted there, as we are informed by the police.”
They further say: “According to the averments of the petition, the average daily attendance at the Globe Theater is between 600 and 700 persons. On information which we ■deem entirely reliable, and from personal inspection of the premises, we believe that fully one-half of such attendance is made up of boys under twenty-one years of age ; that said theater, as conducted by the relators, is calculated to debauch and injure the morals of boys and young men ; ” and, finally they say “ they carefully and in good faith examined the application of the relators for license, and, having heard ■■and duly considered all the facts and circumstances of the ■case, decided that the best interests of the public demanded that such application be refused. We do not, on the evidence and circumstances of this case, believe that the relators are fit persons to be granted a license to sell liquor, or that a bar-room in connection with their theater is necessary for the public accommodation.”
*106 It was objected, at the argument, on the part of the relators, that the averment that their theater “ was frequented by thieves and idle and vicious persons; that many complaints have been make to the police department by persons who have been robbed there; that many complaints have been lodged by persons who have been assaulted there,” is bad for want of certainty; inasmuch as it does not specify what thieves or idle or vicious persons, nor by whom complaints have been lodged, nor what robberies or assaults have been committed at that place, nor when nor by whom. It is objected that, without such certainty, the relators are deprived of their only remedy, in. case these averments should be taken to be true while actually false — namely, an action for false return — and that therefore they cannot be taken to bo true.
/^It is to^observed that the requirement of certainty in the return to a writ of mandamus applies to those particular facts by which what is called the “excuse ” of the respondents is to be made out. For example, in cases where the respondents would justify refusal to admit to office, or justify an amotion from office, the existence of the very facts of the non-election to the office, or of the very facts ivhich establish a power of amotion, is the test of the lawfulness of the act of the respondent; and therefore these facts must not only be set forth, in order to enable the court to apply to them the law', but they must be pleaded with certainty, to meet the relators’ rights. Tapping on Mandamus, 352 to 357. Thus, if the fact that the theater was frequented by thieves or idle and vicious persons, or the fact that robberies or assaults were committed there, was a condition of respondents’ power to refuse a license for a bar-room in that place, it would bé necessary to establish these very facts by (pleading them in the return with, certainty. But it is claimed by respondents that the existence of these facts is not the test or condition of their power to refuse a license,, and that they have discretion to determine what reasons *107 shall justify such refusal, provided their determination be reasonable in contemplation of law; and that, consequently,, the only fact which they are required to show to the court is, that they have exercised their discretion, upon a reasonable examination. In that case the averment in question would be regarded as only a statement of certain reasons which respondents had considered in exercising their discretion.
Of course we cannot determine what the return should show, and what should be pleaded with certainty, until we determine what were actually the conditions of the power of respondents.
This question was considered by this court in Manion’s Case, 6 Mackey, 409, in connection with the power of the Commissioners to make rules on this subject, and we had supposed it was settled; but, ■ as we have acquiesced in-further argument on the matter, we shall again examine it.
It was urged at the argument on the part of the relator,, that, in considering this question, our stand-point should be, that the applicant for such a license should be regarded simply as a business man, proposing to engage in a lawful business. Undoubtedly the keeping of a bar-room or tippling-liouse is treated by the statutes of this District as lawful, and the license for it is provided for in an act which was described by the Legislative Assembly simply as “An act imposing license-taxes on trades, business, and professions, practiced or carried on in the District of Columbia,” a title which certainly ignored any distinction between this and the most necessary and beneficial vocations. The provisions of this act, however, are more significant than its title. Section 10 enacts, “ That every place where distilled or fermented liquors are sold in less quantity than one pint, to be drunk on the premises, shall, unless kept by apothecaries, be known as a bar-room, sample room or tippling-house,as the case may be; and it shall be the duty of the proprietor of every such place to present, with his application. *108 for license, the written permission of a majority of the ■owners of real estate, and a majority of the residents keeping house on the same side of the square where it is ■desired to locate such business, and of the square fronting opposite the same, which permission shall be certified to by the assessor of the district in which such business is to be located ; and such license shall not be issued until approved by the Board of Police.”
This last provision was already in force by an act of Congress. Section 3 of the Act of July 23, 1866, which is now. section 435 of the Revised Statutes of the District, declared that: “ It shall be unlawful for any person or persons keeping an ordinary, restaurant, saloon, or other place where spirituous liquors are'sold, within the District, to give, sell, or dispose of any intoxicating drinks without a license approved by the Board of Police; and no license shall be considered legal by any of the authorities having jurisdiction within the District, until the same has been approved by the Board of Police, and so certified by the secretary thereof under the office seal.”
These provisions distinguish broadly the so-called “ business ” of keeping a bar-room or tippling-house, and the other businesses mentioned in the license act. In the first place, it could not be carried on without the “ permission ” of certain neighbors; and even this permission secured nothing; the license could still be refused. In the next place, notwithstanding a bar-room was to be licensed as a business, the question whether it should be licensed at all was treated as a police question. For this assignment of the subject of retail liquor licenses cannot be supposed to have been a matter of mere convenience, and without any special purpose. By the Act of March 3, 1863, Ch. 106, 12th St., 803 (Section 335 of the Revised Statutes of the District), the Board of Police had already been specially charged with the duty to see that all law's regarding intemperance, disorder^ persons, vagrants, gambling, &c., were promptly enforced; as well *109 as with the duty, “ at all times of the. day and night * * * * to preserve the public peace, and to prevent crime and arrest, offenders.” The subjects of intemperance and public peace and prevention of crime were coupled in one section and in one catalogue of duties, as equally and in the same manner pertinent to police supervision. We understand^ then, that when the approval or disapproval of retail liquor licenses was entrusted to the same board, it was'done because that subject was akin to their previous duties, and was to be dealt with as one of the elements of the good order which it was charged to watch over, (it can hardly be conceded, then, that this business must be regarded by us from the same standpoint with other licensed businesses.') By requiring the permission of neighboring property owners and housekeepers, the law itself has placed bar-rooms and tippling-houses on a footing of toleration; and these considerations cannot be overlooked in determining the nature and extent of power over licenses, which the law intended to vest in the police.
In view of these considerations, we think that by simply giving to the Police Board power to approve orto disapprove a retail liquor license, and omitting to prescribe any limitations or rules for its exercise, Congress gave discretionary power.
Whatever ‘ that power may have been, it is now the measure of the power possessed by the Commissioners of the District. By the Act of June 11, 1878, 20 Stat., 102, the Board of Police was abolished, and all of its powers and duties were transferred to the Commissioners. Of course^ they were to be exercised by the latter, as they had been by the Police Board, as an-element of police supervision, and subject to the same conditions -which had applied to the discretion of that Board.
There is nothing alarming in the' term discretionary power. It has a legal meaning, with safe limitations. ' The intendment of a law which grants it-, whether expressly or *110 by implication, is that the discretionary decision shall be the outcome of examination and consideration; in other words, that it shall constitute a discharge of official duty, and not a mere expression’of personal will. An arbitrary disapproval of a license,' for example, determined upon without an' examination óf relevant facts, and expressing nothing but the mood of the officer, would not be, in contemplation of láW, an exercise of the power granted. It would' constitute, on the contrary, a neglect and refusal to perform Ins official functions, and would expose him to the interference of tins court by the • writ of mandamus. To what effect, however, would be a distinct question?
If, then, the respondents had discretionary power, what averments must their return contain, in justification of their refusal to issue a license? We have said that the rule of certainty applies only to the pleading’of those facts which constitute the tests or conditions of their power, and which show that it has been lawfully exercised. So, is it necessary, then, to state with certainty anything more than the fact that they have made an examination in obedience to the implied requirement of the law; and the further fact that, upon such examination, they believe that a license should not be granted to the petitioners, either because they are not fit persons, or because a bar-room should not, as a matter of public interest, be licensed in conjunction with the Globe Theater? Is it necessary that they should also state with certainty, so as to establish them as facts, or state at all, the matters of fact on which they based their decision ?
These questions, as to what averments are necessary in showing a lawful exercise of discretionary power, were most carefully considered by Lord Ellenborough in’ The King vs. The Archbishop of Canterbury and The Bishop of .London, 15 East, 117. Discretionary power to approve and license lecturers was .vested in their lordships, and they had refused a license to the Rev. Richard Povalr to preach *111 the Friday morning lecture at St. Bartholomew, Exchange, London. In showing cause why a mandamus should not issue, the bishop stated, though with prolixity, nothing. more than the facts that he had carefully examined .Dr. Povah’s fitness, and that he had in consequence decided that the appellant was not. a fit person to be licensed. No facts proving such unfitness were stated. Upon this kind of showing, Lord Ellenborough said: “Now, if instead of. these matters being disclosed as they are in the bishop’s affidavit in answer to the rule, the court had granted the mandamus, and the same matters had been returned to the writ, would not such a return have been conclusive upon the point? Unquestionably it would, unless the court were prepared to decide that the function of approbation is vested in them, and not in the bishop; and that notwithstanding the conscientious judgment which upon a full and deliberate consideration of the subject, he has come to, and his declared conviction that he would be acting in a manner wholly inconsistent with the duties of his episcopal function, and the trust reposed in him by the legislature, if he did license him, we should nevertheless grant a mandamus to the bishop to say — approve though you do not approve; take our conscience to guide you, and not your own.”
It is obvious that the facts necessary to show the proper exercise of discretionary power are pleaded with as much certainty in the case before us as in the case just referred to'. The special reasons for respondents’ decision — that is\ to say, the alleged fact that robberies were committed at the Globe Theater, and that it was the resort of thieves and disorderly persons — were stated unnecessarily, and it is immaterial whether they are pleaded with tha't degree of certainty which will establish them as facts.
It may be convenient to add, in connection with this question of defective pleading, that an amendment of the return may be allowed in such cases, if justice appears to *112 require that course. It is undoubtedly true that at onetime, at the common law, no such amendment was permissible ; but that severe rule, never reasonable, was relaxed,, until now there is no certain rule. The principal which governs the courts is, “ that an amendment shall, or shall /not, be permitted to be made, as it will best tend to the-furtherance of justice.” Tapping on Ma-nd., 334, 368, 369 Evans’ 'Prac., 405.
It was next objected that, notwithstanding a decision by one having discretionary power is conclusive when it is the-consequence of a proper examination, it is not so when the-"^examination appears to have been improperly conducted,, and that, as a matter of fact, the examination in this case-was not conducted properly or lawfully.
It appears by the return that the respondents received,, as aids in forming their judgment, the unsworn reports of the police officers; and by the uncontradicted averments of the petition, that they denied the petitioners a rehearing as to the truth of these reports. The methods of the respondents are impeached on the ground, apparently, that they were arbitrary in excluding a formal contest. To-what methods, then, were the Commissioners limited ? The interests and wants of the public, and not any pre-existing right of the petitioners, were the subjects which they were charged to ascertain, when application was made for license. Therefore, their mode of inquiry, and' of satisfying their own judgments, was not subject to the rules which apply to-the ascertainment of disputed private rights. As no mode of inquiry is prescribed ”5y the statute, the Commissioners are, by implication, authorized to adopt any that may reasonably be used in attaining the end in view. They were the head of a police force, which it was their duty to employ in watching over good order and preventing crime. The facts which might determine their approval or disapproval of a license, such as the assembling of disorderly persons, were the very matters which it was the duty of *113 their subordinate officers to observe. It was not only reasonable, then, that they should derive information from that source, in aid of their executive discretion, but it may even be said to be an intepjdment'of'law, in every system^ of executive discretion, that the executive head may act upon "mere information derived from his accountable subordinates.
This difference between an inquiry into disputed private rights and an inquiry intended simply to ascertain the interests of the public, was considered and well stated in Randenbusch’s Appeal, 120 Pa. St., 342. Mr. Justice Paxson, speaking for the court, there said: “ The law of the land ’ has decided that license shall be granted to some extent, and has imposed the duty upon the court (of sessions) of ascertaining the instances in which the license shall be granted. In order to perform this duty properly, the act of assembly has provided means by which the conscience of the court may be informed as to the facts ; it may hear petitions, or remonstrances, or witnesses; and we have no doubt the court may in some instances act upon its own knowledge. The mere appearance' of an applicant for license when he comes to the bar of the court, may be sufficient to satisfy the judge that he is not a fit person to keep a public house. The judge is not bound to grant a license to a man whom he knows to be a drunkard or thief, or has actual knowledge that his house is not necessary for the public accommodation. The object of evidence in such cases is to infprm the conscience of the court, so that it can act intelligently and justly in the performance of a public duty. Whilst the act of deciding in such cases is quasijndicial, the difference between the granting and withholding of a license, and the decision of a question between parties to a private litigation is manifest. Neither the petitioner nor any other person in this State has any property in the right to sell liquor.”
The same kind of objection as in this case was made in *114 King vs. The Bishop of London, 15 East, 117, where the respondent had refused to license a lecturer. Lord Ellen-borough there said : “ It has been urged, however (and much stress was laid upon it at the argument), that it was the duty of the bishop to have instituted his inquiry upon the subject, in the manner and by the means usually adopted in courts of law; that is, by the formal production of the charges made against the applicant in a judicial course, and by a public and solemn hearing of the several parties, their proofs and witnesses. But in the first place, what power has the bishop to compel the attendance of parties and witnesses; what power has he to administer an oath or what word is there in the Act of Parliament that prescribes the mode by which lie shall attain a conscientious satisfaction on the subject ? It only requires him first to approve, that is before he licenses; and in so doing it virtually requires him to exercise his conscience, duly informed, upon the subject; to do which he must duly, impartially, and effectually inquire, examine, deliberate, and decide.”
The principle recognized in both of the cases referred to is, that inasmuch as the object of evidence in such examinations is merely to inform the conscience and judgment of the officer, such evidence may be taken in any way that is reasonably sufficient for that purpose. The officer is not governed by the rules of litigious evidence, and his decisions are not to be deemed arbitrary, merely because they are founded upon information which a court would hold not to be evidence at all. •
We not only adhere, then, to the opinion expressed in Manion’s Case, that the Commissioners have full discretion in the matter of retail liquor licenses, but we hold that they may conduct their inquiries by what may be called executive methods. Here we might rest our own inquiry, having found that the respondents have decided upon examination lawfully made. But, inasmuch as it was urged at the argu *115 ment that the grounds of decision, shown by the return, are open to review here, and that if these grounds are insufficient, we may disregard the decision itself, and then require the respondents to issue the license, we shall consider that proposition.
It is claimed that, for the reason referred to, there has been an abuse of discretion, and the case of Virginia vs. Rives, 100 U. S., 323, was cited in support of the proposition. We do not find in that case any support for it. A case had been removed from the State court to the Circuit Court of the United States in Virginia, by order of the latter. On an application for a writ of mandamus, the Supreme Court decided that the Circuit-Court had no jurisdiction, and therefore had no discretion whether to hold or remand the case to the State court. There was just one act which the Circuit Court was competent to do'; namely, the act of remanding, and as to this it had no discretion. Of course, then, there could be no abuse of discretion; and of course the Supreme Court, in commanding the only act that could oe done, was neither interfering to control judicial discretion nor interfering to exercise judicial discretion correctly. It is true that Mr. Justice Strong did say, “It (the writ of mandamus) does not lie to control judicial discretion, except when that discretion has been abused;” but he added immediately: “It is a remedy when the case is outside of the exercise of this discretion, and outside of the jurisdiction of the court or officer to which orto whom the writ is addressed;” and it was on this latter ground that the writ was issued. This is further shown by the authorities to which the learned judge referred. They do not touch the question whether the superior court maj'- substitute its own discretion in cases where the respondent appears to have abused his discretion.
Tapping, one of the authorities referred to in Virginia-us. Hives — and there is no higher authority — discusses the result of the cases on thjs point, in the following passage:
“ The Act of Uniformity, 13 and 14 Car, 2, made a license *116 necessary in order to enable a lecturer to preach; and gave-authority to the bishop, &e., to grant it, if the applicant appeared to him to be duly qualified. The writ, on a proper case, will therefore be granted to command a bishop to proceed to inquire whether the prosecutor be duly qualified to-be licensed as a lecturer according to the statute, because no appeal lies. Many dicta of the judges are also to be found, to the effect that the court of King’s Bench will not suffer the bishop to exercise arbitrarily the power given to him by the statute, but that where a person appears to have a right, it will command the bishop to grant a license, or show cause to the contrary. Such a course does not show that the judgment of the bishop upon a matter of which he has-exclusive cognizance, and which the legislature has confided to his sole judgment, * * * is not a good reason against the interference of the court by mandamus; and in fact there has never been an instance of a mandamus to compel a bishop to approve and license a lecturer, where the question turned on the approbation or disapprobation of the bishop as to the fitness of the applicant; never has there been a case where the court so interposed against the bishop-, in abrogation of his judgment against the personal fitness of the applicant for license.” Tapping on Mand., 144.
In the King vs. The Bishop of London, supra, one of the cases to which Tapping refers, Lord Ellenborough said:I “There is no instance of such au application for a man-1 dam us to compel a bishop to approve; we can only compeL him to inquire. * * '* "If the court have reason to think that anything is defectively done in this respect (that is, as to inquiry), it will interpose its authoritative admonition. The mandamus to license, if the party shall be found to be a fit person, is a solemn and peremptory call upon the bishop to adopt the requisite means for duly informing his conscience, in order to the correct and effectual exercise of this most important duty.” .fiTliere is no authority, then, for the claim that the power to issue the writ of mandamus *117 Includes the power to compel an officer having discretion to decide in a particular mannerlfon the ground that he. appears to have abused his discretion. If there is ahy-case In which the court could specifically require the issue of a license, it would be where the return substantially shows •that the "officer has found all the facts to be jin favor of a license, and yet arbitrarily refuses to grant^tjj. In such a case it might, perhaps, be said that discretion had been •exercised and exhausted, and that the officer declined to do what he himself had decided to be his next duty. That must have been the ground of Lord Mansfield’s dictum in The King vs. Blooer, Burr., 1045, when he said: “If the bishop had refused without cause to license him, he might have had a mandamus to compel the ordinary to grant him •a license;” a dictum to which Lord Ellenborough seems to add his approval in the case above referred to. It would seem to have been assumed that a' refusal without cause was equivalent to an admission that' there was no reason why the applicant should not have a license.
We have examined the questions presented in this case more at length than we should otherwise have thought needful, in order to settle, as far as possible, the power of the authorities of this District over a subject which grows * every day more important. We conceive that the Commis.•sioners have done their duty.

The ivrit of mandamus is therefore denied.