[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 257 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 258 
Before the court is the complaint brought on behalf of nine Negro veterans of World War II for injunctive and other relief. Plaintiffs are honorably discharged veterans and are and have been residents of East Orange, both at the *Page 259 
time of their entry into and their discharge from service. Each of them is a citizen of the United States, married, and each has at least one child. Plaintiffs are regularly employed and each receives monthly wages at least four times the monthly rental fixed for the project. They are in need of housing and have made timely application to the City of East Orange for accommodations in the emergency housing project. None has been accepted as tenants in the South Arlington Avenue project solely because that project admittedly has been reserved by the City of East Orange for occupancy by white veterans.
Four housing projects have been commenced under R.S.
55:14G-1. et seq., P.L. 1946, c. 323, in the City of East Orange located as follows: 146-158 South Arlington Avenue containing 44 dwelling units; 68-78 Elmwood Avenue containing 40 dwelling units; Rhode Island Avenue and Chelsea Place containing 20 dwelling units; and 291-295 North Clinton Street containing 14 dwelling units. Of these only one, the project on South Arlington Avenue has reached that state of completion where families have been accepted as tenants and are in possession of their apartments. All such families admitted as tenants to this apartment are white. In leasing apartments in this project the plan followed by the City of East Orange was to exclude Negroes. William M. McConnell, a member of the City Council of East Orange, and chairman of the Veterans Housing Committee, in his reply affidavit says: "It was the intent and policy of the City to assign the first Negro tenants recommended by the Screening Committee and whose applications have been and are being investigated, to site No. 2 (North Clinton Street) which affords at least equal dwelling facilities to the other three sites. This policy was established by the City after careful study and consideration of the experience and general tenant relationships obtained by the governing body in temporary veterans' housing projects heretofore furnished by the City under both Federal and State temporary housing programs."
Under R.S. 55-14G-2, P.L. 1946, c. 323, the "authority" mentioned in the act is defined to mean the Public Housing and Development Authority in the State Department of Economic *Page 260 
Development. "Administrator" means the administrator of the Public Housing and Development Authority who is the Commissioner of the Department of Economic Development. The present administrator is the defendant, Charles R. Erdman, Jr. His deputy is the defendant, William T. Vanderlipp.
The administrator has promulgated regulations under which priorities for tenants are to be established as follows: (a) distressed veterans or families of veterans; (b) distressed servicemen or families of servicemen; (c) distressed families of non-veterans or servicemen; (d) non-distressed veterans or families of veterans; (e) non-distressed servicemen or families of servicemen; (f) non-distressed families other than veterans of servicemen.
The City of East Orange, by the members of its City Council and the mayor, are the agencies charged with the renting of the several projects. The individuals composing the City Council, the mayor, the Commissioner of the Department of Economic Development of the State of New Jersey, and his deputy administrator, and the City of East Orange are named herein as defendants.
Plaintiffs seek injunction enjoining the defendants from denying to plaintiffs and other qualified Negro applicants equal opportunity to be considered for admission to the various emergency housing projects under their control and supervision where such denial is solely because of the race or color of such applicants, and from asking information on or anywise considering race, creed, color, national origin or ancestry in any application for occupancy in such projects under their control and supervision and from considering race, creed, color, national origin or ancestry in processing, investigating or acting upon any such application.
The South Arlington Avenue project was commenced October 27, 1947 and according to William M. McConnell, chairman of the veterans' permanent housing committee of the City of East Orange, the structure, although not yet fully completed or accepted by the state agency, was, by agreement with the state agency because of the dire need for housing by qualified veterans, recommended by the screening committee for immediate *Page 261 
occupancy, and thereupon 26 families were placed in the finished units of that project. It is not denied that the families thus placed in that housing project are exclusively white. None of the other projects have as yet reached the stage of completion. Each of the plaintiffs has filed his application for admission to the housing projects constructed and under construction, and from all that appears before me they are qualified for consideration. No reason for their disqualification is presented and I must assume that none exists, unless the color of the plaintiffs can be regarded as a valid reason justifying their exclusion from three of the four housing projects and their segregation into one of those projects. That the latter represents the view of the municipal authorities admits of no doubt.
The complaint is that in the selection of tenants for occupancy in the South Arlington Avenue project, which has been completed, and for the other projects at Elmwood Avenue and Chelsea and Rhode Island Avenue, the defendants have adopted a policy of refusing to admit qualified Negro applicants solely because of their color and have for the same reason refused to consider their applications for admission to such projects. The policy thus complained of is admitted in the replying affidavit of the chairman of the municipal committee. It is admitted that Negro applicants were to be assigned to the North Clinton Street project and thus segregated from the white applicants.
Under section 3 of the act the Public Housing and Development Authority in the Department of Economic Development is given complete power and authority to coordinate "all the programs, planning and construction contemplated by the provisions of this act, and to do and to authorize all things incidental, desirable or necessary to effect the purposes thereof in accordance with such rules and regulations as may be established by the Administrator and approved by the Economic Council of the Department of Economic Development."
By section 12 of the act, when an emergency housing project is available for occupancy the administrator may commit to any public corporation, municipality or other public agency such property for operation and management as emergency housing at such rentals "and with such preferences as to occupancy *Page 262 
and upon such terms and conditions as shall be for the best interests of the public."
Section 21 of the act provides: "For all of the purposes of this act, no person shall because of race, creed, color, national origin or ancestry be subject to any discrimination."
The defendant, City of East Orange, and the defendant members of the City Council are respectively a municipal corporation and public officials performing a necessary public function under the act. Their acts are the acts of the State within the purview of section 1 of the Fourteenth Amendment of the Constitution of the United States which provides in part:
"* * No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."
Thus, in Virginia v. Rives, 100 U.S. 313, 318,25 L.Ed. 667, 669, the court stated "It is doubtless true that a State may act through different agencies — either by its legislative, its executive, or its judicial authorities; and the prohibitions of the amendment extend to all action of the State denying equal protection of the laws, whether it be action by one of these agencies or by another." In Shelley v. Kraemer (1948),334 U.S. 1, 92 L.Ed. 1161, it was said: "In the Civil Rights Cases, 109 U.S. 3, 11, 17, 27 L.Ed. 835, 841, this Court pointed out that the Amendment makes void `state action of every kind' which is inconsistent with the guaranties therein contained, and extends to manifestation of `state authority in the shape of laws, customs, or judicial or executive proceedings.' Language to like effect is employed no less than eighteen times during the course of that opinion."
In Home Telephone Telegraph Co. v. City of Los Angeles,227 U.S. 278, the United States Supreme Court held that acts done under the authority of a municipal ordinance passed in virtue of power conferred by a state are embraced by the Fourteenth Amendment to the Federal Constitution.
The four projects above referred to are not a private enterprise, financed with private funds, as was the situation in the *Page 263 
case of Dorsey v. Stuyvesant Town Corporation, 190 Misc(N.Y.) 187, affirmed by the New York Supreme Court, Appellate Division, on December 20, 1948. Here all four projects are financed by public funds furnished in part by the State and in part by the municipality. The question therefore posed in the case at bar is whether a municipality, charged with the management of several public housing projects being erected with public funds, may, in the face of the Federal Constitution and of our own statute (R.S. 55:14G-21, P.L. 1946, c. 323,sec. 21), exclude persons of the colored race from three of those projects and segregate them within the fourth of those projects. Is such segregation unlawful discrimination?
In the briefs of counsel appear many citations from the federal jurisdiction. I do not consider it necessary to discuss them in detail. They may all be summarized by the single statement that by the Fourteenth Amendment the colored race was raised to the dignity of citizenship and equality and the states were prohibited from abridging the privileges and immunities of persons of that race. This amendment has uniformly been held to protect all persons, white or black, against discriminatory legislation or action by the states. We need not step out of our own decisions to determine whether in this State segregation constitutes unlawful discrimination. Two decisions are deemed controlling. In Bullock v. Wooding, 123 N.J. Law 176, (Sup.Ct. 1939), the court dealt with the complaint of a colored person who sought to be admitted to the facilities of public beach No. 1 at Long Branch, New Jersey. The municipal authorities had divided the bathing beach into four sections, all of equal facility and desirability, but under an ordinance had pursued the policy of segregating colored persons within beach No. 3. The plaintiff was denied access to the beach of her choosing. She brought certiorari to review the ordinance. Although the court held that mandamus was the proper remedy to compel the City of Long Branch to grant to the plaintiff a permit or license to the beach of her choosing, the court nonetheless passed upon the meritorious question involved. It said: "It is, of course, settled that the dignities, equalities and rights of citizenship cannot legally be denied to members of the negro *Page 264 
race. Cf. Buchanan v. Warley, 245 U.S. 60; 62 L.Ed. 149;Patterson v. Board of Education, Trenton,11 N.J. Misc. R. 179, 164 Atl. Rep. 892; affirmed, 112 N.J.L. 99, 169 Atl.Rep. 690."
In the cited case of Patterson v. The Board of Education ofthe City of Trenton our courts dealt with a policy of the Trenton Board of Education which permitted the students of a high school to enjoy indiscriminately the advantages of the classroom and the facilities of the gymnasium but would not permit the colored students to take swimming lessons during such periods as the white students received such instruction. The colored students were permitted to take swimming lessons only with those of their own race. This was held to be unlawful discrimination. Mandamus was allowed and that action was affirmed.
Here the State itself has not offended. Quite the contrary. Under the very law permitting these public projects there is an explicit prohibition against discrimination because of race, creed, color, national origin or ancestry. By this legislation the people of this State declared its policy that such public housing projects, financed in whole or in part with public funds, shall be equally and commonly available to all citizens, free of that discrimination condemned by the statute. Is this not as it should be? The public funds emanate from common sources, without distinction of color, race or creed. The duties and responsibilities of citizenship are discharged alike by the white and colored citizens, witness the effort made, the blood shed, and the lives sacrificed on common battle fields by citizens of all kinds of color, creed and race. Man's sense of justice, coupled with an enlightened understanding of our common humanity, would dictate that if there be no segregation in the field of civic duty and sacrifice, there be none in the realm of human dignity and equality.
The defendants herein, other than the State of New Jersey and its said officials who are made parties hereto, insist that segregation in the East Orange housing project is not discriminatory because the facilities made available to colored applicants are of equal, if not better, character than those furnished to white applicants. This argument lacks validity. In *Page 265 
the two cases last cited the facilities offered by the municipalities were of like character and equal quality. In fact, in the Trenton school case the facility offered to the colored students (the swimming pool) was the same facility made available to the white students. There only the time for utilization was different. Yet that single circumstance was held to be an act of unlawful discrimination. The holdings in these two cases settle the law on the point in controversy in the present case and I hold that the segregation, frankly admitted by the city authorities, is unlawful discrimination and violates not only our general policy of the law but also the provisions of the very statute under which these projects have been erected. The City of East Orange and its municipal agents and agencies will be restrained from taking any action in furtherance of the city's admitted policy and purpose of segregation. The motion to strike the complaint as insufficient in law is denied.
In the brief for the State and its two officials it is conceded that the segregation here complained of is unlawful discrimination. It is claimed, however, that the State has not approved the municipality's policy and acts of segregation, that the state officials learned of it only by the fact of the bringing of the within suit, and that the State has the matter under factual investigation. It therefore would appear that the State has neither done nor threatened to do any act violative of plaintiffs' rights. The motion to strike the complaint as against the State and Charles R. Erdman, Jr., Commissioner of the Department of Economic Development, and William T. Vanderlipp, Deputy Administrator of the Public Housing and Development Authority in the Department of Economic Development of the State of New Jersey, is granted.
An order of preliminary injunction and the other orders contemplated by the foregoing views should be presented on notice to adverse parties. *Page 266