**Charles O. BELL, Jr., and Tank Trucks, Inc., Appellees,**

v.

**BURLINGTON NORTHERN RAILROAD COMPANY, and Sam Scully, Appellants.**

**No. 62757.**

Court of Appeals of Oklahoma, Division No. 4.

Aug. 5, 1986.

Rehearing Denied Sept. 2, 1986.

As Corrected Sept. 9 and Oct. 3, 1987.

Certiorari Denied Nov. 19, 1986.

Michael D. Parks, Stipe, Gossett, Stipe, Harper, Estes, McCune and Parks, McAlester, for appellee Charles O. Bell, Jr.

Richard Gibbon, Gibbon, Gladd and Associates, Tulsa, for appellee Tank Trucks, Inc.

Grey W. Satterfield, Kornfield, Franklin & Phillips, Oklahoma City, for appellant Burlington Northern.

BRIGHTMIRE, Judge.

Foremost among the issues raised in the defending railroad's appeal from the judgment below is the effect of its ill-fated lunch hour removal of the action to federal court which it sought in an effort to abort and lay waste to a long trial just as argument to the jury was about to commence. Notwithstanding the removal, the trial judge proceeded to complete the trial which eventuated in a verdict and judgment for plaintiffs.

We hold no reversible error affects the judgment and affirm it.

## I

The operative facts are these. Near Kiefer, Oklahoma, on a hot August day in 1981, a tank truck driven in a westerly direction by 27–year-old plaintiff Charles O. Bell—and owned by plaintiff Tank Trucks, Inc.—was struck at a railroad crossing by a speeding, northbound, backward-traveling engine, owned and operated by defendant Burlington Northern Railroad Company.

Bell, whose multiple injuries included loss of his right leg, a fused left leg, and a practically useless right arm, and Tank Trucks each filed lawsuits against Burlington and its train conductor, Sam Scully, seeking recovery of damages each had sustained—Bell for his injuries and Tank Trucks for destruction of its truck.[1] Each plaintiff alleged the commission of specific acts of negligence by each of the defendants which contributed to the cause of the wreck. The railroad's engineer was said to be operating the engine at an unreasonable speed of 58 miles per hour in a posted speed zone of 45 miles per hour and failed to sound a whistle as the engine approached the subject crossing. Burlington otherwise contributed to the disaster, according to plaintiffs' evidence, by allowing a blind crossing to exist, created by a growth of trees and brush on its right-of-way some 320 feet south of the crossing—the direction whence came its backing engine.

Following some twenty-one months of pretrial preparation, including extensive discovery activity, a jury was seated June 13, 1983, in Sapulpa, Oklahoma, to decide the factual issues. For over a week the parties presented their evidence to the jury. Plaintiffs supported their allegations with evidence of both negligence and consequential damages. Demurrers of both defendants to plaintiffs' proof were overruled and both presented their defensive evidence. The parties rested during the morning of June 21, 1983. Defendants each again "demurred," and the trial judge indicated that because the alleged negligence of conductor Scully was imputable to the railroad, the instructions and verdict forms might be easier to prepare and understand if he sustained the conductor's demurrer. Neither plaintiff agreed to the proposed ruling and Tank Trucks objected to a demurrer being sustained. Nevertheless the conductor's demurrer was sustained and he was dismissed from the case. The court then instructed the jury on the law and recessed for lunch.

After the noon break the court and jury reassembled. Defense counsel at once stood up and announced in open court that it had filed a petition for removal to federal court during the noon recess and advised that "the court has lost jurisdiction." The trial judge, however, disregarded the maneuver and directed the lawyers to make their arguments to the jury. They did. The jury was then sent out to deliberate and eventually it returned a verdict finding plaintiff Bell twenty percent at fault and

---

1. The two cases were consolidated for trial.

the railroad eighty percent. Mr. Bell's damage was fixed at $1,090,602.07 and Tank Trucks' at $34,000.[2]

Plaintiffs moved for a new trial against defendant Scully and at the same time filed motions in federal court to reject the removal action and remand the matter to state court. On March 27, 1984, the U.S. District Court did so saying, among other things, that the federal court was "without jurisdiction" and that the court had "considerable doubt as to whether [the actions were] properly removed" in the first place.

Thereafter plaintiffs' motions to reinstate Scully as a defendant were overruled, and on June 26, 1984, the state judge rendered a judgment on the verdict previously returned. On the same day the court overruled plaintiffs' motions for a new trial. The judgment was stayed after defendant filed a supersedeas bond on June 29, 1984, and this appeal was filed July 25, 1984.

## II

Burlington's first proposition is that the trial court erred in failing to instruct the factfinders that conductor Scully's negligence could not be imputed to the railroad or even considered by them in determining its liability.

Defendant's supporting argument is a convoluted attempt to reconcile two inconsistent positions it took during the proceedings below with respect to the conductor's dismissal. On the one hand it represented to the federal court as the basis for its attempted removal that Scully's dismissal was a voluntary one by plaintiffs. On the other hand it represented to the state court that the dismissal was an involuntary one by the court entitling it to the jury instruction concerning the legal effect of Scully's negligence.

The trial background for the issue is this. After the instructions were read, defense counsel began arguing once more about the instructions being misleading in that the court had held plaintiffs could not recover against Scully and yet at the same time instructed the jury members that the train crew were the agents of the railroad, and they could consider their negligence. "Now, that's misleading," said defense counsel, "and I think it's imperative that the Court tell the jury ... or allow Counsel to do it—that Sam Scully has been released as a matter of law and that his negligence can't be considered."

This introduced an extended rehash of what had already been settled after extensive discussion earlier in the day. What transpired after this raises the question of whether defendant was maneuvering for removal. As the lunch hour approached the court summed it up this way: "We talked a little bit [earlier in the day] and you all [referring to defendants] had moved that he get out, and I was trying to find a way to get him out as an individual. If you feel that there is some problem with what we have done, over the lunch hour, you all think about it."

"For the time being, let's leave it as it is, and we'll take it up further after lunch," said the Burlington lawyer.

"Maybe we can put him [Scully] back in after lunch," a plaintiff lawyer suggested.

"I indicated to you that I could leave him in," said the judge.

The court recessed for lunch.

When court reopened after noon, defense counsel did not "take it up further", however, but told of the removal as we mentioned earlier. The trial court decided to complete the nearly-finished trial and did.

It is not necessary to go into the tortuous circuitry of defendant's argument further than to point out that there are two fundamental reasons why the court properly declined to give an instruction precisely like the one orally requested by defendant. First, the court gave an appropriate instruction on the subject, which the defendant had agreed to earlier in the day, and also told the jury that Scully was out of the lawsuit. And second, for the court to have gone beyond this and told the jury they

---

**2.** At first they returned with a punitive damage award equal to the amount of the compensatory damage award, but upon being polled it appeared the award was error. They returned to the jury room and later returned with a corrected verdict which awarded no punitive damages.

could not consider the negligence of Scully would have been an erroneously restrictive comment on the evidence which would likely have confused the jurors and misled them into thinking that Scully had been charged with one or both of the two main wrongful acts complained of, when in fact he had not been so charged, but had been accused only of a failure to properly perform the supervisory role of subprincipal, i.e. prevent other employees from committing the wrongful acts that caused the wreck. Whether Scully properly carried out his responsibility or not neither increases nor diminishes the vicarious liability of the railroad because it was, after all, based on (a) the tortious conduct of the engineer, and (b) the wrongful acts of its other agents in failing to maintain a safer crossing. In other words under the facts of this case, Scully's dismissal—even if considered to be a finding of no civil liability on his part—does not have the exonerating effect on the railroad's respondeat superior liability that it would have if Scully were an employee whose specific tortfeasance was alleged to have caused the wreck. *See Hooper v. Clements Food Co.*, 694 P.2d 943 (Okl.1985).

■ It also follows from the foregoing that giving agreed instruction No. 11 on agency was not misleading. All it said was that an act or omission of a train crew member acting within the scope of his authority or employment was in law the act or omission of the defendant railroad. That is the law.

Defendant's first contention is without merit.

### III

■ Burlington's second assignment of error involves the construction of 28 U.S.C. § 1446(e) and the argument is that the trial court was without jurisdiction to take any

further action in the case after receiving notice that defendant had taken the necessary steps to remove the case to federal court during the noon-hour recess on June 21, 1983.[3]

For support it relies mainly on the views of a Florida law student and a federal appeals court case quoting the thoughts of Professor Moore with respect to the meaning of § 1446(e).[4] That law states that when a defendant has filed a petition for removal and has otherwise complied with certain filing and notice requirements "the state court shall proceed no further unless and until the case is remanded."

The case that kindled the law student's rather caustic condemnation was one handed down in 1975 by the Florida Supreme Court in *Wilson v. Sandstrom*, 317 So.2d 732 (Fla.1975), *cert. denied*, 423 U.S. 1053, 96 S.Ct. 782, 46 L.Ed.2d 642 (1976), in which it was held that an unsuccessful attempt to improperly remove a state court case to federal court does not deprive the state court of jurisdiction.

What the law student waded into was a legal controversy that arose after the passage of § 1446(e) in 1948—a controversy that forms the foundation for Burlington's second attack on subject judgment. Without demonstrating evidence of an in-depth study of the problem or favoring the reader with fundamental legal reasoning, the student took to task not only the high court of Florida but a federal court as well for a ruling contrary to his views. It was suggested that the federal judge and *Wilson* all but stood alone against a "battery" of cases holding otherwise.[5] This rhetoric, however, borders on hyperbole. Overlooked or disregarded were other cases reaching the same result as the Illinois federal court such as *Victory Cabinet Co. v. Insurance Co. of North America*, 183

---

**3.** 28 U.S.C. § 1446(e) was first enacted in 1948 as a consolidation of the previously existing 28 U.S.C. §§ 72, 74, and 76. It was amended in 1949 and again in 1977. See "Historical and Revision Notes" following § 1446 in U.S.C.A.

**4.** Case Note in 30 Univ. Miami L.Rev. 739 (1976) somewhat pompously entitled, "Florida Puts Federal Removal Jurisdiction and the Thir-

teenth Amendment in the Doghouse." The circuit court case is *U.S. ex rel. Echevarria v. Silberglitt*, 441 F.2d 225 (2d Cir.1971).

**5.** The condemned case is *F & L Drug Corp. v. American Central Insurance Co.*, 200 F.Supp. 718 (D.Conn.1961).

F.2d 360 (7th Cir., 1950). *See also People v. Purofoy*, 116 Mich.App. 471, 323 N.W.2d 446 (1982); *Styers v. Pico, Inc.*, 236 Ga. 258, 223 S.E.2d 656 (1976); and *Doerr v. Warner*, 247 Minn. 98, 76 N.W.2d 505 (1956).

Frankly, we think the reasoning of *Victory Cabinet Co.* is sound. The 1948 enactment replaced removal statutes that had been on the books for many years. 28 U.S.C. §§ 72–76. The question that emerges from a review of both the old and new removal laws, the before and after decisions on the subject, and the historical facts and circumstances surrounding the 1948 enactment is whether § 1446(e) was intended to and in fact did nullify the reasonable and practical principle promulgated by the United States Supreme Court in *Metropolitan Casualty Insurance Co. v. Stevens*, 312 U.S. 563; 61 S.Ct. 715, 85 L.Ed. 1044 (1941), in construing basically the same language in § 72, namely, the phrase "proceed no further." Said the court:

> "The rule that proceedings in the state court subsequent to the petition for removal are valid if the suit was not in fact removable is the logical corollary of the proposition that such proceedings are void if the cause was removable."

In other words the Supreme Court found these rules to be implicit in the old statute's proscription "proceed no further." We are of the opinion the new statute did not intend to and in fact did not alter the *Metropolitan* rationale or implications.

An analysis of § 1446(e), especially in context of the restrictive provisos of subsections (a), (b) and (d), we think confirms this conclusion. Subsection (e) reads:

> "(e) Promptly after the filing of such petition [for the removal of a civil action] and bond the defendant or defendants shall give written notice thereof to all adverse parties and shall file a copy of the petition with the clerk of such State court, which shall effect the removal and

the State court shall *proceed no further* unless and until the case is remanded." (Emphasis added.)

As we mentioned earlier in footnote 3, the "Historical and Revision Notes" of the United States Code Annotated state that subsection (e) "is derived from sections 72, 74 and 76 of Title 28," U.S.C., 1940 edition. The fact is that the language of § 1446(e) we have italicized is exactly the same language contained in the preexisting statute —28 U.S.C. § 72. After specifying steps required to effect a removal, § 72 provided, upon fulfilling the prerequisites, that: "It shall be the duty of the State Court to accept said petition [of removal] and bond and *proceed no further* in such suit."

As we indicated, the phrase "proceed no further" is the crucial one in both the old and new statutes and on its face is a definite unlimited command to cease exercising jurisdiction once a petition for removal is filed and bond and notice requirements have been met. No end of the terminating command was mentioned in the old statute. Obviously the implication has always been that it ended if and when the case was remanded.[6] But the statute did not expressly say this and so it appears that Congress thought it should be made clear by adding the narrowing language, "unless the case is remanded."[7] The appended words were limiting in nature, that is, they limit rather than extend the scope of the "proceed no further" clause. Certain it is that the "unless" phrase presents no connotation of an intent to nullify the salutary, perceptive and sensible *Metropolitan Casualty Insurance Co.* precept. Had Congress so intended it would have said so.

Looking at the issue from another perspective, that of jurisdiction, one would have to say that if, upon the filing of a petition for removal, the state court ipso facto loses all jurisdiction and it is later determined that the federal court has no jurisdiction then we have the anomalous phenomenon of litigants being cast into a judicial netherland, the existence of an ac-

---

6. *See e.g.* the problem in *Styers v. Pico, Inc.*, 236 Ga. 258, 223 S.E.2d 656 (1976), involving the effect of a dismissal of a removed case before remand.

7. The words "and until" were not added until 1949.

tion suspended in a jurisdictionless void, a lawsuit in limbo as it were, where it is possible to remain indefinitely if the federal court chooses not to act. It is reasonable to assume that in enacting § 1446(e) Congress did not intend such a result nor did it intend to provide a defendant with a means of halting a lengthy trial just before the case is to be given to the jury, especially if the attempted removal is frivolous, doubtful, in bad faith, or otherwise improper. For to intend such a result is to unnecessarily impose an onerous burden on both the federal and state judicial systems, promote great waste of state resources, and oppress hapless removal-related litigants by subjecting them to distressing losses of time and money and often deprive parties of justice, all wrought by unwarranted removal delay that can last for months as indeed it did in this case. These haunting problems warrant emphasizing a point we discuss more fully later on, namely, that § 1446 contemplates that once the trial of a civil case has begun, the plaintiff should be permitted to complete it even in the face of the filing of a removal petition. This is the implicit holding of *Lathrop, Shea, & Henwood Co. v. Interior Construction & Improvement Co.*, 215 U.S. 246, 30 S.Ct. 76, 54 L.Ed. 177 (1909). *See also Connelly v. Jennings*, 207 Okl. 554, 252 P.2d 133 (1952).

Parenthetically, it should be noted that several years prior to *Metropolitan* the supreme court of this state reached the same legal conclusion in *Sinclair Oil & Gas Co. v. Albright*, 161 Okl. 272, 18 P.2d 540 (1933). Akin to this rule is an even more cogent one stated in *Great Northern Ry. v. Alexander*, 246 U.S. 276, 38 S.Ct. 237, 62 L.Ed. 713 (1918), in which the Supreme Court of the United States held:

> "[T]he plaintiff may, by the allegations of his complaint, [there being no fraudulent purpose to evade removal] determine the status with respect to removability of a case, arising under a law of the United States, when it is commenced, and that this power to determine the removability of his case continues with the plaintiff throughout the litigation, so that whether such a case non-removable when commenced shall afterwards become remova-

ble depends not upon what the defendant may allege or prove or what the court may, after hearing upon the merits, in invitum, order, but solely upon the form which the plaintiff by his voluntary action shall give to the pleadings in the case as it progresses."

*See also* the construction of 28 U.S.C.A. § 1332 by the high court in *Kellam v. Keith*, 144 U.S. 568, 12 S.Ct. 922, 36 L.Ed. 544 (1892), holding that for removal to be proper on the ground of diversity such ground must exist at the time the action is filed in state court and must still exist at the time the petition for removal is filed. All of the foregoing law has been settled so well for so long that the question of the railroad's good faith looms exceedingly large with regard to its attempted removal of sub judice case.

Finally, we think the new statute does not contemplate removal after trial has commenced in a state court civil action. The 1948 revision changed primarily the methodology of perfecting a removal proceeding. State court involvement was eliminated. With regard to criminal matters, § 1446(c) authorizes removal of criminal prosecutions only before trial. And while the provisions relating to civil cases—subsections (a), (b), and (d)—do not expressly mention such a restriction, they seem to contemplate only pretrial removal because the limits they prescribe are related to pretrial matters, namely, receipt by defendant of the initial pleading, service of summons, receipt of "an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." The new statute like its predecessor has universally been given a strict construction in favor of state court jurisdiction, and the federal courts have taken the position that they have no authority to enlarge, change or modify the clear terms and provisions of removal statutes. The oldest circuit decision cited for this rule in note 2 of § 1446 is *Delbanco v. Singletary*, 40 F. 177 (9th Cir.1889), and the latest is *American Home Assurance Co. v. Insular Underwriters Corp.*, 494 F.2d 317 (1st Cir.1974).

Such, incidentally, was the construction given § 1446 by the high tribunal of this state in *Connelly v. Jennings.* In holding that that law did not contemplate removal after commencement of a trial, the court rejected defendant's argument that § 1446 changed the rule theretofore adopted by the U.S. Supreme Court in construing the old removal law saying:

"We do not think this change [§ 1446] was intended to affect a case that was in the process of being tried, but only applied to matters arising prior to trial. We realize that this view is subject to the criticism that a cause is permitted to be retained in the state court just by the strength of the pleadings and not by the facts; but this condition existed prior to the change, and Congress must have been aware of the Supreme Court's interpretation of the question, and if it intended to change the rule as to cases in process of trial it would have done so."

This view is further confirmed by the rationale and holding of the court in *Virginia v. Rives,* 100 U.S. (10 Otto) 313, 25 L.Ed. 667 (1880), strictly construing a civil rights removal statute as being applicable only to pretrial removal.

We hold, therefore, that the proceedings and judgment rendered in this case after the removal petition was filed were not void and their validity became unchallengeable upon it being determined that the federal court never acquired jurisdiction of the lawsuit—a conclusion that is in harmony with the pronouncement of the United States Supreme Court in *Metropolitan Casualty Insurance Co.*

### IV

■ Burlington's third proposition concerns the trial court's failure to prevent what Burlington considers to be prejudicial references by plaintiff during the trial to his family and the effect of his injuries on them.

More specifically, the complaint is that plaintiff's counsel mentioned to the jury several times in substance that plaintiff lived in Sapulpa with his wife Betty and his two boys, ages two and six. He did it during voir dire to determine if the prospective jurors knew any of them. He mentioned the family again during opening statement, during Mrs. Bell's direct examination, and during plaintiff's brother's testimony to develop the nature of Mr. Bell's association with his children before his injuries and how the injuries had adversely affected the relationship. Defendant relies on some case law in this state that predates our 1978 evidence code, e.g. *Midland Valley Ry. v. Manios,* 307 P.2d 545 (Okl.1956). Thus resolution of this issue requires a consideration of 12 O.S.1981 §§ 2401, 2402 and 2403. "All relevant evidence is admissible, except as otherwise provided by [law]", reads § 2402. The term "relevant evidence" is defined in § 2401 to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." And finally, § 2403 authorizes exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise."

We hold the evidence complained of was relevant evidence concerning plaintiff's detriment. In his petition, plaintiff pleaded that before the extensive injuries inflicted on him by defendant he was a 27–year-old able-bodied man able to care for his wife and two children. Now, however, he is a cripple, totally and permanently disabled, whose earning capacity is destroyed and who is suffering both severe physical pain and mental anguish. These allegations furnished a sufficient predicate for admitting evidence with respect to the nature and extent of his family and his familial obligations as foundation proof of the following elements of detriment: (a) mental distress resulting from impairment of capacity to support and care for his family, and (b) impairment of his capacity to enjoy a normal family life with regard to his

relationship to and interaction with both his wife and his two little boys.[8]

## V

■ Defendant's last contention is that various rulings throughout the trial demonstrated a bias in favor of plaintiffs of such a nature as to "constitute reversible error."

We are not sure we fully understand this one. Ordinarily one thinks of disqualifying a judge because of a bias, but not of a bias as such being a reversible error. There, of course, may be errors which occur as a result of bias or a bias can prevent a party from receiving a fair trial. Here the defendant attempts to establish a bias on the basis of a course of conduct it disapproves and argues the alleged bias per se is an error. The occurrences which are said to demonstrate a bias are: (a) sustaining plaintiffs' objection to the train engineer sitting at the counsel table as the railroad's representative. This was later resolved by a withdrawal of the objection; (b) sending the sheriff to get some people who were striking a local glass plant when additional prospective jurors were needed for selection of an alternate juror who, as it turns out, never became a juror; (c) inconsistent rulings, as perceived by defendant, with respect to the scope of cross-examination of two different witnesses; and (d) inconsistent rulings according to defendant, on some motions in limine.

To give the defendant a full measure of consideration we will treat its proposition as though it presents this critical issue— whether, under all the circumstances, defendants received a fair trial. We have reviewed these matters not only in terms of defendant's argument but in context of a multi-volume 1450-page record. The case was tried with vigor by competent and experienced counsel on both sides of the lawsuit. If we were to concede that one or more of the foregoing complaints had some merit we do not think it would justify an inference of a judicial bias that prevented defendants from receiving a fair trial. As a matter of fact considering defense counsel's strategem we think the trial court demonstrated a remarkable understanding of the issues, reasonable restraint, unruffled temperament in the face of perturbable legal complexities, and he managed to maintain control of a lawsuit that could have easily been lost in the storm of rigorous advocacy. If indeed the trial judge made some mistakes so did defense counsel. For example, defendant's complaint about inappropriate rulings with regard to its cross-examination of a witness is a rather curious one because defendants obviously should not have been permitted to "cross-examine" themselves. Surely, given the purpose of and reason for cross-examination, defense counsel does not expect us to take seriously his contention that the court erred in refusing to permit him to cross-examine his own client who had been called to the stand by plaintiffs. There is, of course, a distinct difference between a request to "cross examine" a defendant put on the stand by plaintiff and a request to cross-examine a non-party witness called by defendant. The trial court had a right to and should have exercised his discretion differently under such circumstances.

To recapitulate we are not persuaded that the alleged errors complained of demonstrate a bias for or against either party. And our review of the lengthy record leads us to the conclusion that while the parties may not have received a perfect trial, they received a fair one and one free from reversible error.

Affirmed.

STUBBLEFIELD, P.J., and RAPP, J., concur.

■

---

**8.** *See* 23 O.S.1981 §§ 1, 3, 4, 5 and 61. *See also, Lebrecht v. Bethlehem Steel Corp.*, 402 F.2d 585 ■ (2d Cir.1968).